**UNITED STATES of America, Appellee,**

v.

**Angel REYES, a/k/a Jose Konig Mangele, etc., Appellant.**

**No. 89–2073.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 17, 1990.

Decided July 9, 1990.

Rehearing and Rehearing En Banc Denied Sept. 11, 1990.

282

James C. Delworth, St. Louis, Mo., for appellant.

Michael Fagan, St. Louis, Mo., for appellee.

Before McMILLIAN and MAGILL, Circuit Judges, and HANSON,* Senior District Judge.

MAGILL, Circuit Judge.

Angel Reyes–Resendez (Reyes) appeals his conviction [1] on thirteen counts of making false statements in violation of 18 U.S.C. §§ 2, 911, 1001, 1002, 1028, and 1542, and 42 U.S.C. § 408(g)(2), one count of being an alien unlawfully present in the United States in violation of 8 U.S.C. § 1326, one count of possessing false identification in violation of 18 U.S.C. § 1028(a)(3), and one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). The district court [2] sentenced him to concurrent thirty-month terms on each of the first fifteen counts.

---

* THE HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. Reyes proceeded at trial *pro se.*

2. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

On the final count,[3] he was sentenced to a concurrent twenty-four-month term.

Reyes argues that the district court erred when it denied his motions to suppress items seized from a bus locker and statements made to a pretrial services officer. Furthermore, Reyes argues that the district court erred by increasing his base offense level pursuant to Sentencing Guideline § 2F1.1(b)(2)(B) for participating in a scheme to defraud more than one victim, § 2F1.1(b)(2)(A) for engaging in more than minimal planning, and § 3C1.1 for obstruction of justice. This appeal presents five issues. First, whether Reyes had standing to contest a warrantless search of a rented locker which took place after the rental period had expired when he was prevented, because of his lawful arrest, from renewing the rental period.[4] Second, whether Reyes had a right to have the officer who was attempting to complete a pretrial release report read him the *Miranda* warnings before asking him his name when the officer informed him that his response would not be used against him at trial on the charges he was then facing.[5] Third, whether agencies of the United States Government with distinct interests can constitute separate victims under § 2F1.1(b)(2)(B). Fourth, whether the district court erred in increasing the base offense level by finding that Reyes had engaged in a scheme which involved more than minimal planning. Finally, whether the trial court erred in increasing the base offense level by finding that Reyes had willfully impeded or obstructed the administration of justice by refusing to obey a court order to provide a sample of his handwriting style. After a review of the entire record, we affirm. However, because we hold that Reyes had no right to be read his *Miranda* rights and that agencies with distinct interests can constitute separate victims under § 2F1.1(b)(2)(B), our affirmance is based, in part, on different grounds.

I.

The United States deported Reyes, a Nicaraguan citizen, for illegally entering this country in 1987. Undaunted, he shortly thereafter reentered the United States and began a life of crime. On April 29, 1988,[6] Reyes knowingly made several fraudulent representations to Social Security Administration officials in St. Louis, Missouri. In an attempt to secure a social security card under a false name, Reyes fraudulently represented on Social Security Form SS-5[7] that his name at birth was Daniel Edward Arnold, that he was born on June 14, 1954 in Coffeyville, Kansas, that his mother's name at her birth was Mattie E. Stafford, that his father's name was Charles E. Edward, that 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 was his social security number, and that he was a United States citizen.

On May 4, Reyes again visited the Social Security office in St. Louis and filled out another Form SS-5. The information he provided was identical to that which he fraudulently provided on April 29 with two exceptions. First, Reyes fraudulently identified his father as Charles D. Arnold. Second, he fraudulently reported his social security number to be 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.

On June 20, Reyes went to the St. Louis Post Office in order to complete a United States passport application. The information he provided was identical to that which he fraudulently provided to the Social Security Administration on April 29 with three exceptions. First, Reyes fraudulently reported that his home phone number was 512-854-4016 and that his business

---

**3.** This count involved Reyes' unlawful presence in the United States in violation of 8 U.S.C. § 1326.

**4.** Because we hold that Reyes had no standing to challenge the admission of the items seized in the locker, we need not reach the other issues raised by both the government and Reyes concerning the warrantless search of the locker.

**5.** Because we hold that Reyes had no right to have his *Miranda* warnings read to him, we

need not reach the issue of whether he knowingly and intelligently waived his rights.

**6.** All dates hereinafter refer to the calendar year 1988 unless otherwise noted.

**7.** Social Security Form SS-5 is an application for an original or replacement social security card.

phone number was 314–621–1288. Second, he fraudulently reported that his father's name was Charles Daniel Arnold and that his mother's name was Mattie Edward Stafford. Third, he fraudulently represented that his social security number was 433–86–7453.

On November 30, agent Todd Ostrom lawfully arrested Reyes. Agent Ostrom then conducted a search of Reyes and found in his possession several false identification documents and a key, which the agent subsequently discovered opened a storage locker at the Greyhound bus station. The identification documents included (1) a Michigan identification card bearing the name and address of Daniel Edward Arnold; (2) an Ann Arbor, Michigan Public Library card in the name of Daniel E. Arnold; (3) a Texas identification card in the name of Daniel Edward Arnold; (4) a book of checks in the name of Daniel Edward Arnold; and (5) a blood donor card signed by Daniel Eduardo A., III.

On December 1, pretrial services officer Carbol interviewed Reyes for the sole purpose of gathering information for a pretrial services summary report to be used by the district court in determining whether Reyes would be eligible for pretrial release. Reyes misrepresented to officer Carbol that his name was Jose Konig Mangele. Shortly thereafter, Reyes stated that because he thought officer Carbol was his attorney he had probably said too much, and he therefore would answer no more questions nor sign the advice of rights form which officer Carbol had read to him.

Reyes knowingly made additional misrepresentations on December 1. At his initial appearance, Reyes fraudulently informed Magistrate Carol Jackson that his name was Jose Konig Mangele, that he was born in Managua, Nicaragua and that he had never been convicted of any crimes.

On December 8, Reyes made a fraudulent statement to agent Ostrom regarding material facts within the jurisdiction of the United States Immigration and Naturalization Services. Reyes misrepresented to agent Ostrom that his name was Jose Konig Mangele, that he entered the United States around March 1988 during Mardi Gras in New Orleans, Louisiana, and that Daniel Arnold had given him a social security card.

On December 12, agent Ostrom took the key he had seized from Reyes on November 30 to the Greyhound bus terminal. He contacted the manager of the terminal who, after determining that the locker's rent was overdue, opened it with his master key. Inside the locker, agent Ostrom discovered a receipt from a San Antonio pawn shop for a gun, five Kansas birth certificates in the name of Daniel Edward Arnold, letters addressed to Daniel Arnold and several identification cards in the name of Daniel A. Eduardo, III.[8] Agent Ostrom also discovered a black bag in which he found a gun and a large knife.

Reyes had rented this locker at the terminal on November 30 and had paid rent until December 1. On the locker was printed the warning that "[a]fter 24 hours [the] contents may be removed and held [*][9] days then sold for accrued charges." Pursuant to company policy, the lock is plugged if the locker is not renewed after the expiration of the rental period. The company did in fact plug the lock of the locker Reyes had rented. After five days the contents are removed for storage.[10] When the contents are removed, the company makes a list of the items removed and attaches a tag to each. If the company

**8.** These documents included (1) a Kansas birth registration card in the name of Daniel Edward Arnold; (2) a voter's registration card from the St. Louis Board of Election Commissioners in the name of "Edwardo Daniel A. III"; (3) a Cloud County, Kansas voter's registration certificate in the name of "Edwardo Daniel A. III"; and (4) a Bexar County, Texas, voters registration certificate in the name of Angel Joseph Reyes.

**9.** After a review of the photocopy of Government Exhibit 20 provided to this court, we note that the time period is illegible. However, the time period is not relevant for purposes of our discussion.

**10.** Although Reyes had not paid rent for more than five days, the company had not yet removed his items from the locker.

discovers firearms or ammunition in the lockers, it contacts the police and turns the items over to their custody.

Following a three-day trial, the jury deliberated for approximately two hours before finding Reyes guilty of all sixteen counts of the indictment. The district court sentenced him to fifteen concurrent thirty-month sentences and one concurrent twenty-four-month sentence. It is from his conviction and the district court's sentencing order that Reyes appeals.

## II.

### A.

■ Reyes argues that the district court erred in refusing to suppress items seized from the bus locker. The district court found that Reyes had no standing to challenge the introduction of the items seized from the locker. In order to successfully challenge the constitutionality of the search, Reyes must show that he possessed a reasonable expectation of privacy in the area searched or the items seized. *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); *Rakas v. Illinois*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978); *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In order to demonstrate the existence of a reasonable privacy expectation, a defendant must not only prove that he subjectively believed that the area or item was private but society must be "prepared to accept that expectation as objectively reasonable." *Greenwood*, 486 U.S. at 39–40, 108 S.Ct. at 1628–29.

Reyes rented the locker on November 30, 1988 for a period of only twenty-four hours. Clearly printed on the front of his locker was a warning that if he did not renew his rental period or remove his items, they would be removed and possibly sold. Reyes did not pay for additional time or remove his items after the expiration of the twenty-four hours. As a result, his rental term expired on December 1, several days before agent Ostrom conducted the warrantless search of the locker. Therefore, Reyes could not have had a legitimate expectation of privacy at the time of the search.[11] *See United States v. Larson*, 760 F.2d 852, 854–55 (8th Cir.) (no legitimate expectation of privacy at time of search when rental period elapsed and defendant did not sufficiently communicate with motel personnel his intention to renew term), *cert. denied*, 474 U.S. 849, 106 S.Ct. 143, 88 L.Ed.2d 119 (1985); *see also United States v. Ramirez*, 810 F.2d 1338, 1341 (5th Cir.) (no reasonable expectation of privacy in hotel room after rental period expired), *cert. denied*, 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987).

■ Reyes argues that this conclusion is in error for several reasons. First, he argues that he cannot be denied standing even if his rental period had expired because he was prevented by the government due to his confinement from renewing the locker or removing the items. In *United States v. Croft*, 429 F.2d 884 (10th Cir. 1970), the court confronted this exact issue. The defendant's rental period in *Croft* expired before the officers entered the hotel room. The defendant argued, however, that the "expiration of the rental period should not control in this case because his arrest prior to check-out time prevented him from returning to the motel and perhaps extending the rental period." The Tenth Circuit rejected this argument finding that "it was defendant's own conduct[, i.e., his illegal activity,] that prevented his

---

**11.** We also note that the company had plugged the lock after the expiration of Reyes' rental period. Therefore, even if he had wanted to retrieve his items after the expiration of the rental term, he would not have been able to do so on his own because the company, by plugging the lock, exercised exclusive dominion and control over the locker and its contents pursuant to the clearly stated company policy on the outside of the locker. Therefore, Reyes could not have had a legitimate expectation of privacy in the locker at the time of the search because a third party had exclusive control over the locker and his items. *Cf. United States v. Wiley*, 847 F.2d 480, 481 (8th Cir.1988) (per curiam) (defendant lacked standing to challenge search of codefendant's home because defendant had no key, no access to home when codefendant was not there, and no access to closet where codefendant kept his drugs).

return to the motel." *Id.* at 887. We find *Croft* to be persuasive and hold that a defendant has no standing to contest a warrantless search of a rented locker which took place after the rental period had expired even when he was prevented from renewing the rental period or removing the locker's contents because of his lawful arrest.[12]

Reyes' rental term expired on December 1, 1988. The police search occurred after the expiration of the rental period on December 12. As a result, we have concluded that Reyes had no legitimate expectation of privacy in this locker. This conclusion is not affected by the fact that Reyes was lawfully arrested prior to his renewal time and thereby was prevented from returning to the terminal and removing his items from the locker or extending the rental period. It was Reyes' own conduct, his illegal activity, which precipitated the arrest and prevented his return to the locker. Accordingly, we affirm the district court's denial of his motion to suppress the items seized in his locker on the basis that Reyes lacked standing to object. *See id.; Ramirez*, 810 F.2d at 1341 & n. 3 (dictum) (even if appellants had argued that their arrest constituted an involuntary relinquishment of control over the hotel room that would otherwise maintain any previously held expectations of privacy, the Fifth Circuit notes that their finding that appellants had no reasonable expectation of privacy in their hotel room would not be affected).

■ Second, Reyes argues that the locker remained locked and he possessed the key. As a factual matter, Reyes did not possess the key. Agent Ostrom seized it after his arrest. However, even if he did possess the key, the rental term had expired. Merely because someone possesses a key to a locker does not necessarily mean that he has an expectation of privacy in it. Because the rental term had expired, Reyes had no expectation of privacy in the locker. His continued possession of the key does not alter this finding. In any event, the key would not have opened the lock of the locker anyway because the company had plugged the lock.

Merely because the locker remained locked does not change our conclusion that Reyes did not have an objectively reasonable expectation of privacy for three reasons. First, the company did in fact open the locker when it plugged the lock. Second, although the locker otherwise remained locked, Reyes was locked out of the locker because the company had plugged the lock. Third, whether the locker in fact remained locked is irrelevant. As far as Reyes knew or should have known, after twenty-four hours his items were removed by the company pursuant to the policy clearly printed on his locker. Therefore, after twenty-four hours, he may have had a subjective expectation of privacy but such an expectation was not objectively reasonable since the company had locked him out of the locker and could remove his items at any time.

■ Third, he argues that he was not asked if he wished to keep the locker or abandon its contents. When agent Ostrom went to the bus terminal, Reyes no longer had an expectation of privacy in the locker. Agent Ostrom discovered that Reyes' rental period had expired and that, according to the terms of the policy printed on the locker, his belongings were subject to removal by the company. We can identify and Reyes refers us to no constitutional requirement that the police must ask a defendant if he wishes to keep a locker in which he no longer has an expectation of privacy and which is under the exclusive control of a third party. We refuse to construct such a rule today.

### B.

Reyes argues that the district court erred in denying his motion to suppress a statement made to pretrial services officer Carbol. Officer Carbol interviewed Reyes

---

**12.** Because we hold that Reyes had no standing to challenge the admission of the items seized in the locker, we need not reach the other issues raised by both the government and Reyes concerning the warrantless search of the locker.

for the sole purpose of gathering information for a pretrial services summary report to be used by the district court in determining whether Reyes would be eligible for pretrial release. After officer Carbol read Reyes the rights printed on the advice of rights form, he asked Reyes his name. Reyes misrepresented to officer Carbol that his name was Jose Konig Mangele. Reyes subsequently stated that he thought officer Carbol was his attorney[13] and discontinued the interview.

Reyes argues that he did not knowingly and intelligently waive his rights before answering officer Carbol's question. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Therefore, he argues we must reverse the district court's refusal to suppress his statement. Reyes also argues that the advice of rights form created a "quasi-use immunity" under which the information obtained at the interview could not be used against him. We find these arguments to be without merit.

First, although it appears that Reyes was given the substance of the *Miranda* warnings before he misrepresented his name to officer Carbol,[14] we assume, without deciding, that he did not intelligently or knowingly waive his rights. However, we hold that Reyes did not have a right to be read the *Miranda* warnings before being asked his name by officer Carbol. Therefore, whether he knowingly and intelligently waived them is irrelevant.

Although Reyes' response to the request for his name could have potentially incriminated him on the offenses with which he was already charged, the advice of rights form which was read to him stated in part that:

No information I give to the Pretrial Services Officer can be used against me at trial on the charge(s) I am now facing. However, this information can be used against me if I am charged with perjury or false statements allegedly made in the course of obtaining pretrial release, or if I fail to appear for any court proceeding I am required to attend.

It is clear from this form that even if Reyes had provided incriminating information, it would not have been used against him at trial on the charges he was then facing. Because the advice of rights form prohibited such use, the routine information Reyes provided could not therefore have incriminated him. As a result, the only purpose officer Carbol's question could have furthered was routine processing. Officer Carbol was merely attempting to gather information for a report to be used by the district court in determining whether the defendant would be eligible for pretrial release. Therefore, Reyes had no right to have the *Miranda* warnings read to him. *See United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir.1989); *United States v. Prewitt*, 553 F.2d 1082, 1085 (7th Cir.) (per curiam), *cert. denied*, 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977). We note, however, that a different case would be presented if officer Carbol had asked Reyes his name without informing him that his response could not be used against him at trial on the charges he then faced. We further note that Reyes did not have a right to be read the *Miranda* warnings only to the extent officer Carbol asked him routine processing-type questions such as Reyes' name, address or related mat-

---

**13.** Officer Carbol testified that he clearly identified himself and did nothing to mislead or confuse Reyes.

**14.** The "advice of rights" form stated in part that:

I know that I have the right not to answer these questions.

I know that I have the right to speak to an attorney before answering any questions. If I cannot afford an attorney, I can request that the court appoint an attorney to represent me at public expense.

If I decide to answer the questions asked by the Pretrial Services Officer, what I say will be used by a judge to determine whether I should be released on bond pending trial or detained in jail. Also, I understand that any information that I give to a Pretrial Services Officer will be given to my attorney and to the attorney for the United States.

I know that I have the right not to answer any question about the alleged offense and should not discuss it with a Pretrial Services Officer.

ters. *See United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir.1986) (routine background or booking questioning does not constitute interrogation where questions not reasonably likely to elicit an incriminating response). We have not found this processing exception to *Miranda* to extend any further. *See id.* Furthermore, we need not and do not decide today whether the *Miranda* background exception extends any further.

■ Second, the advice of rights form did not create any "quasi-use immunity" in favor of Reyes. The form clearly states that any information provided could be used against Reyes if he was subsequently charged with perjury or false statements which were made *in the course of obtaining pretrial release.* Reyes argues that officer Carbol did not request his name in the course of obtaining pretrial release but in the course of advising him of his constitutional rights. This argument is without merit. An advice of rights form is filled out in the course of obtaining pretrial release. Therefore, the fraudulent misrepresentation made to officer Carbol was made in the course of obtaining pretrial release. Because the statement was used only for convicting him on a subsequent charge of knowingly making a false, fictitious or fraudulent statement and was not used at trial to help convict him on the charges he faced at the time of his interview, the advice of rights form provided him no "quasi-use immunity." Therefore, we affirm the district court's finding that the statement was admissible against Reyes on the false statement count.

### C.

■ Reyes further argues that the district court erred when it found that he was involved in a scheme to defraud more than one victim pursuant to Sentencing Guideline § 2F1.1(b)(2)(B). Section 2F1.1(b)(2)(B) provides that when a defendant is involved in a scheme to defraud more than one victim, the court must increase the base offense by two levels. In support of his allegation of error, Reyes argues that (1) the United States Government, its agencies

and officials do not constitute victims within the meaning of § 2F1.1; (2) nevertheless, the district court properly grouped all the counts as involving only one victim (the United States); and (3) the district court was inconsistent when it grouped all the counts as involving only one victim while, at the same time, finding Reyes had schemed to defraud more than one victim. We hold that the United States Government or an agency thereof can be a victim within the meaning of § 2F1.1(b)(2)(B). An examination of the Guidelines is instructive.

The Sentencing Commission clearly indicated in Guideline § 3A1.2 that the government or an agency thereof could be a victim. Application Note 1 to § 3A1.2 states that the official victim guideline does not apply when the *only victim* is an organization, agency, or the government. Therefore, the government or an agency can be a victim under the Guidelines, but § 3A1.2 specifically does not apply when the government or an agency is the only victim.

Section 2F1.1(b)(2)(B) does not contain any such limitation. The Commentary states that:

[A] '[s]cheme to defraud more than one victim,' as used in subsection (b)(2)(B), refers to a design or plan to obtain something of value from more than one person. In this context, "victim" refers to the person or *entity* from which the funds are to come directly.

*Id.* (emphasis added). The Commentary clearly states that a victim can be an entity. There is no language in this section which excludes governmental entities. By contrast, in § 3A1.2 the Commission clearly stated the official victim guideline would not apply when the only victim is an organization, agency, or the government. The lack of such limiting language in § 2F1.1(b)(2)(B) is crucial. The Commission clearly excluded agencies of the government as victims under § 3A1.2 but used broad, unlimited language in § 2F1.1(b)(2)(B).

An examination of § 3D1.2(a) further demonstrates our point. That section pro-

vides that "[c]ounts involve substantially the same harm within the meaning of this rule ... when counts involve the same victim and the same act or transaction." As with § 2F1.1(b)(2)(B), there is no language limiting the scope of victims to exclude governmental entities. In *United States v. Kim*, 896 F.2d 678 (2d Cir.1990), the Second Circuit found that the United States Government could be a victim pursuant to § 3D1.2(a). *Id.* at 685, 687. Because we discern no difference in the usage of the term "victim" in §§ 3D1.2(a) and 2F1.-1(b)(2)(B), we conclude that § 2F1.1(b)(2)(B) also encompasses governmental entities within its definition of victim.

Our conclusion that the United States Government or an agency thereof can be a victim under § 2F1.1(b)(2)(B) does not end our inquiry, however. We must determine whether the district court properly grouped all counts as involving only one victim, the United States. In *Kim*, the Second Circuit grouped four of the counts of a multi-count indictment because they involved "the same victim, the United States (and its interests in enforcing the immigration laws)." *Id.* at 685. However, the court concluded that while the "alien offense[s] may be grouped with each other ..., the counterfeit money offenses may not be grouped with the alien offenses. The interests protected by the immigration laws and the currency laws are so distinct that it is not realistic to consider both offenses to have as a common 'victim' the United States." *Id.* at 687.

■ Although the *Kim* Court was interpreting § 3D1.2(a), we find its analysis to be persuasive in examining § 2F1.1(b)(2)(B).[15] While it may be proper for the district court to group the counts involving offenses against the Social Security Administration because they involve the same victim, the interests protected by the

social security and immigration laws and the judicial system "are so distinct that it is not realistic to consider" the offenses all to have a common victim. *See id.* We hold that where the interests promoted by different agencies are distinct, the agencies can be separate victims under § 2F1.1(b)(2)(B). Therefore, we conclude that Reyes' scheme involved at least three victims, the Social Security Administration, the Immigration and Naturalization Service, and the United States District Court for the Eastern District of Missouri. The district court therefore properly increased Reyes' base offense level by two levels pursuant to § 2F1.1(b)(2)(B).[16]

## D.

■ Reyes further argues that the district court erred in finding that his conduct involved more than minimal planning pursuant to Guideline § 2F1.1(b)(2)(A). That provision provides for a two-level increase in a defendant's base offense level if his offense involved more than minimal planning. More than minimal planning means "more planning than is typical for commission of the offense in a simple form." § 1B1.1, Application Note 1(f); *see also* § 2F1.1(b)(2)(A), Application Note 2. It can be found "in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." § 1B1.1, Application Note 1(f). It also exists if a defendant takes "significant affirmative steps ... to conceal the offense." *Id.*

After a thorough review of the record, we find Reyes' argument to be wholly without merit. Reyes did not merely illegally enter this country and attempt to conceal his identity by acquiring one piece of identification. His activities went far beyond what was necessary to commit his offense in its simple form. He acquired at least

---

15. Reyes cites *United States v. Berkowitz*, 712 F.Supp. 707, 710 (N.D.Ill.1989), to support his proposition that the government and the agencies thereof cannot be victims. We find the approach adopted by the Second Circuit to be more persuasive.

16. Because we conclude that Reyes' scheme involved more than one victim, we need not examine his final argument that the district court was inconsistent in grouping all of his offenses against the officials and agencies of the government as involving one victim but nevertheless holding that he was involved in a scheme to defraud more than one victim.

twelve pieces of false identification from various parts of the country and attempted to obtain two social security numbers under the name of a handicapped person. In the locker at the bus station, agents found special materials useful in acquiring and creating additional false documents. He wrote checks for which there were insufficient funds and abused automatic teller machines, thereby depriving people of money and property. He was also apparently involved in the selling of controlled substances. He also attempted to conceal some of his offenses by giving false names to law enforcement authorities in order to conceal the fact that he was in the United States illegally. We need not determine the precise minimum threshold for establishing more than minimal planning because whatever it is Reyes far exceeded it. We therefore affirm the district court's decision to increase his base offense level by two levels pursuant to § 2F1.1(b)(2)(A).

### E.

Finally, Reyes argues that the district court erred in applying the enhancement for obstruction of justice pursuant to Guideline § 3C1.1. Section 3C1.1 provides that "[i]f the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level from Chapter Two by 2 levels." The district court based its decision to increase his offense level by two on Reyes' failure to reveal his true identity to the district court and the magistrate during both a trial and a motion hearing and Reyes' refusal to provide a handwriting sample as ordered by a federal district judge. Because we find that the enhancement was justified by Reyes' refusal to provide a handwriting exemplar, we need not reach the issue of whether it was justified by his failure to reveal his true identity to the district court and Magistrate Kingsland.

Reyes' handwriting style was material evidence in his trial. Despite a court order to provide a handwriting sample, Reyes intentionally defied the court, thereby attempting to conceal his handwriting style. The Application Note to § 3C1.1 states that concealing material evidence, or attempting to do so, may provide a basis for a two-level increase. § 3C1.1, Application Note 1(a). Therefore, Reyes' conduct falls squarely within the requirements of § 3C1.1 and the Application Notes.

Reyes argues that § 3C1.1 applies to affirmative acts that are purposely intended to interfere with the judicial process. Because the failure to obey a court order is an act of omission, he argues, the district court erred in applying the enhancement. We reject Reyes' argument. The Application Notes simply do not limit the application of § 3C1.1 to affirmative attempts to conceal material evidence and we refuse to read into the Guideline such a limitation. We hold that where, as here, a defendant refuses to comply with a court order to provide a handwriting sample thereby concealing or attempting to conceal material evidence, his handwriting style, a two-level increase under § 3C1.1 is warranted. *See United States v. Talbott,* 902 F.2d 1129 (4th Cir.1990) (noting that the district court imposed a two-level increase under § 3C1.1 in part because defendant initially refused to provide handwriting exemplars; Fourth Circuit did not review increase under § 3C1.1).

Finally, while Application Note 3 to § 3C1.1 states that this section "is not intended to punish a defendant for the exercise of a constitutional right," Reyes has no constitutional right to defy a court order to provide a handwriting sample. *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Therefore, we hold that the district court properly imposed a two-level enhancement for obstruction of justice.

### III.

In conclusion, we hold that Reyes has no standing to challenge the introduction of items seized pursuant to a warrantless search of a bus station locker which took place after the rental term had expired even when he was prevented, because of his lawful arrest, from returning to the

locker to renew the rental period or remove the items. We further hold that the district court properly denied his motion to exclude his statements made to officer Carbol because Reyes has no right to have the officer, who was attempting to complete a routine pretrial release report, read the *Miranda* warnings before asking him his name when officer Carbol informed Reyes that his response would not be used against him at trial on the charges he was then facing. We further hold that the district court properly imposed a two-level increase pursuant to §§ 2F1.1(b)(2)(A) and (B) because Reyes was involved in a scheme involving more than one victim, several agencies of the United States Government which had distinct interests and because his conduct involved more than minimal planning. Finally, we hold that the district court properly imposed a two-level increase pursuant to § 3C1.1 because Reyes' defiance of the court order to produce a handwriting sample, whereby he concealed or attempted to conceal his handwriting style, constituted obstruction of justice.

McMILLIAN, Circuit Judge, dissenting.

For the reasons discussed below, I do not agree with the majority opinion's analysis in Part II(A) on fourth amendment standing and in Part II(B) on *Miranda* warnings. Accordingly, I respectfully dissent. I would reverse the conviction on count XI (possession of five or more false identification documents in violation of 18 U.S.C. § 1028(a)(3)), count XII (unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)), and count XIII (making a false statement of identity to a pretrial services officer in violation of 18 U.S.C. § 1001), vacate the sentence and remand the case to the district court for resentencing.

FOURTH AMENDMENT STANDING

I acknowledge the "well-settled rule that ... guest[s] in a hotel or motel room [lose their] reasonable expectation of privacy and consequently any standing to object to 'an unauthorized seizure of the premises' after [the] rental period has terminated." *United States v. Jackson*, 585 F.2d 653,

658 (4th Cir.1978), *citing United States v. Parizo*, 514 F.2d 52, 54–55 (2d Cir.1975); *see, e.g., United States v. Ramirez*, 810 F.2d 1338, 1341 & n. 3 (5th Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987). I would argue, however, that the analysis in these cases focused too narrowly on the hotel check-out time or, in the present case, on the expiration of the locker rental period. Standing "should not be determined merely by ascertaining whether in a property law sense the defendant[s] had lost [their] interest in the property [or premises] in advance of the search." 4 W. LaFave, Search and Seizure § 11.3(a), at 287 (2d ed. 1987). This is because the "capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968).

In an early hotel room search case, *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960), the Court emphasized that the warrantless search of the hotel room was lawful because at the time of the search the defendant had already vacated the room. Some time before the 3:00 p.m. check-out time, the defendant had packed and removed his belongings from the room, checked out and paid his hotel bill, albeit under coercion (he was then under arrest). *Id.* Cases decided subsequently by the federal courts of appeals involving hotel room searches have emphasized the check-out time. *See, e.g., United States v. Parizo*, 514 F.2d at 54–55; *United States v. Croft*, 429 F.2d 884, 887 (10th Cir.1970). The check-out time rule is too mechanical and simplistic a measure of hotel guests' continued occupancy of and legitimate expectation of privacy in hotel rooms. If guests occupy their hotel room beyond check-out time, they might become liable to a charge for an additional night's lodging or might expect the hotel staff to enter the room or claim exclusive right to the room. But over-staying guests should not be held to have lost their reasonable

expectation of privacy merely because the check-out time has passed. Regardless of the status of the relationship between the hotel and its guests, the government should not be able to search the room without a warrant the moment after check-out time.

In my view, the analysis in this type of case should focus instead upon whether the defendant abandoned or relinquished any legitimate expectation of privacy in the premises, or storage place, before the search occurred. *Cf. United States v. Paroutian*, 299 F.2d 486, 488 (2d Cir.1962) (unclear whether monthly rent had been paid; however, no indication that defendant did not intend to return to apartment; landlord took no steps to evict defendant until several weeks after warrantless search; defendant had standing); 4 W. LaFave, Search and Seizure § 11.3(a), at 287 n. 41 (citing cases holding no standing when search occurred before term of lease had expired but after defendant had abandoned premises). The check-out time, or the expiration of the rental period, is relevant but not conclusive.

In the present case, I would hold that appellant had a legitimate expectation of privacy in the bus station locker, despite the expiration of the initial 24–hour rental period, and thus had standing to challenge the warrantless search of the bus station locker and the seizure of its contents, specifically the false identification documents and the gun. The notice on the locker stated that there was a $3 fee for each additional 24 hour period or fraction thereof and warned that "after 24 hours contents may be removed and held 30 days then sold for accrued charges." At the time of the search, the initial rental period had expired and the bus station had "plugged" the lock, thus making it impossible for anyone to open the lock without first paying the accrued rental charges. The bus station had not, however, removed the contents of the locker even though several days had elapsed. Other than the bus station, only appellant had a key to the locker and thus control over the locker and its contents. The fact that, according to the terms of the rental agreement, the bus

station could have removed the contents of the locker once the initial 24–hour rental period had expired does not mean that the government could have done so.

The government should have obtained a search warrant. This was not a private search. Although the bus station manager opened the locker with a master key, the search was initiated by and conducted pursuant to an express request of a government agent. Nor was the warrantless search of the locker justified by exigent circumstances. I would also hold that the inevitable discovery exception does not apply. Not only would application of the inevitable discovery exception in the present case undermine the warrant requirement, but also there was no showing that the government agent would have searched the locker during the course of the investigation or that the bus station management was in the process of removing the contents of all the abandoned lockers.

## *MIRANDA* WARNINGS

The majority opinion holds that the pretrial services officer's questioning falls within the exception to the *Miranda* requirements for routine background questioning. I disagree. I would hold that the "booking" exception should not apply because the pretrial services officer's question about identity to someone who is charged with crimes involving false identification was reasonably likely to elicit an incriminating response. For this reason, appellant's false statement of identity should have been suppressed. I would further hold that its admission into evidence was not harmless error.

"A defendant who is placed in custody must receive *Miranda* warnings before being subject to interrogation." *United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir.1986) (question regarding residence held interrogation). However, *Miranda* warnings are not required before the asking of routine booking questions to gather background biographical information. *See Pennsylvania v. Muniz*, —— U.S. ——, ——, 110 S.Ct. 2638, 2646, 110 L.Ed.2d 528

(1990). This is because "background questions rarely elicit an incriminating response." *United States v. Mata–Abundiz,* 717 F.2d 1277, 1280 (9th Cir.1983) (question regarding citizenship held interrogation), *citing United States v. Booth,* 669 F.2d 1231, 1238 (9th Cir.1981). "If, however, the questions are reasonably likely to elicit an incriminating response in a particular situation, the [booking] exception does not apply." *United States v. Mata–Abundiz,* 717 F.2d at 1280; *see Pennsylvania v. Muniz,* —— U.S. at —— n. 14, 110 S.Ct. at 2650 n. 14. The test is an objective one, although the subjective intent of the questioning agent is relevant. *United States v. Mata–Abundiz,* 717 F.2d at 1280. In addition, the relationship of the question asked to the crime suspected is considered highly relevant. *Id.*

I would hold that the identity question does not fall within the exception for routine booking procedures. Even though the questioning in the present case involved background biographical information characteristic of routine booking procedures, the question about identity related directly to an element of the very crimes that appellant was suspected of having committed, that is, using false identification. Under these circumstances, the questioning conducted by the pretrial services officer was reasonably likely to elicit an incriminating response from appellant. *But cf. United States v. Horton,* 873 F.2d 180, 181 & n. 2 (8th Cir.1989) (per curiam) (defendant charged with drug violations; false identification answer during pretrial booking held admissible; defendant did not raise *Miranda* objection).

Because the false statement about identity was the basis of count XIII, its admission into evidence cannot be said to be harmless error.