**UNITED STATES of America**

v.

**James A. BORDINARO.**

**Crim. No. 91–84–01.**

United States District Court,
E.D. Pennsylvania.

Nov. 4, 1991.

1230

Timothy P. Crowley and John P. Yatsko, Trial Attys., Antitrust Div., Philadelphia, Pa., for plaintiff.

William H. Kettlewell, Dwyer Collora & Gertner, Boston, Mass., for defendant.

## OPINION

VAN ANTWERPEN, District Judge.

On October 11, 1991, in Easton Pennsylvania, this court, sentenced the defendant James A. Bordinaro to twelve months imprisonment and imposed a fine of $55,000 based on a two-count guilty plea. After reviewing the presentence report, counsel's memoranda, and all arguments presented at the sentencing hearing, the court made specific findings on the record and imposed sentence pursuant to the federal sentencing guidelines. To ensure that the defendant's rights are fully protected, we issue this opinion.

## FACTUAL BACKGROUND

On March 4, 1991, the defendant James A. Bordinaro was named in a two-count information filed in the Eastern District of Pennsylvania. Count I charges Bordinaro with conspiring to rig bids on frozen seafood contracts awarded by the Defense Personnel Support Center (DPSC) between 1981 and September 1989 in violation of the Sherman Act (15 U.S.C. § 1 et seq.). Count II charges Bordinaro with conspiring to submit false statements to the DPSC concerning the origin of the fish used to fulfill DPSC contracts during the period of May 1986 to September 1989 in violation of 18 U.S.C. §§ 371 and 1001.

### a. *The Antitrust Conspiracy.*

The DPSC, located in Philadelphia, Pennsylvania, is one of six purchasing centers operated by the United States Department of Defense (DOD). The DPSC is responsible, *inter alia*, for purchasing frozen seafood products, the subjects of this information. Regulations require that each bidder certify that its bids are independently determined and not the product of consultation, communication, or agreement with any other bidder.

In 1981, the defendant, James A. Bordinaro of Empire Fish Company (Empire), and one of his co-conspirators, Francis J. O'Hara of F.J. O'Hara and Sons, Inc., began discussing and fixing DPSC bids with other fish processors.[1] Each week, Bordinaro and O'Hara conferred by telephone. The two men would agree which company would be the designated low bidder and what the low bid would be. The companies would then submit bids to DPSC on their designated items at the set prices and would submit complementary bids, that is, intentionally high and unsuccessful bids, on those items allotted to other co-conspirators. This intra-company conspiracy continued until September 1989.

### b. *Conspiracy to Submit False Statements.*

During the period covered by the information, DPSC required that all seafood sold to the DOD be of United States origin. This meant that the seafood must have been caught by a United States fishing vessel, landed in a United States port, and processed in a plant in the United States.

In the early 1980's fish producers found it increasingly difficult to supply DPSC with American-landed fish. Fish stocks were dwindling, and a 1984 World Court decision allocated better fishing grounds to Canada. As a result in early 1986, Empire began to fill their DPSC contracts with Canadian-landed fish. Bordinaro conspired with others at Empire to conceal this wrongdoing by falsely certifying to DPSC that the fish was American-landed. Bordinaro acted independently from certain other bid rigging co-conspirators who also sup-

---

**1.** The following companies were involved with the bid rigging conspiracy at various times: Empire Fish Company, F.J. O'Hara and Sons, Inc., Ocean Crest Seafood, Inc., Channel Fish Co., Channel Fish Processing Co., Inc., Maine Fisheries, Tichon Seafood Corporation, Inc., Cozy Har- bor Seafood, Inc., Anthony Parco, Edward McCollum, Jr., Leonard Parco, Roy Zaffiro, John Zaffiro, Sebastian Milano, Roy Silvestro, David Bergson, David Harmon, Daniel Tichon, and John Norton, Jr.

plied Canadian origin fish to DPSC. This internal company conspiracy continued until September 1989.

c. *The Information and Sentencing.*

On April 12, 1991, Bordinaro appeared before this Court and pursuant to a written plea agreement entered pleas of guilty to both counts of the Information. At that time, the court ordered that a presentence report be completed, and on August 21, 1991, Bordinaro set forth seven objections to the report. On October 11, 1991, this court heard oral argument on these objections and imposed sentence. Defendant's objections to the presentence report are the subject of this memorandum.

## DISCUSSION

The defendant James A. Bordinaro raises seven objections to the presentence report. First, the defendant argues that his antitrust and false statement offenses are "closely-related" and should be grouped together for sentencing, pursuant to § 3D1.2. Second, the defendant argues that under the guidelines for antitrust offenses, he should be subject to a fine ranging from $20,000 to $250,000 rather than a fixed fine of $250,000 as set forth in the presentence report. Finally, the defendant raises five objections to the facts presented in the presentence report. As discussed below, we find no merit to these objections.

1. Considering Multiple Counts.

The defendant has pled guilty to both counts of the information against him. In the case of multiple offenses, the court shall first determine whether any of the offenses should be grouped together as "closely-related counts." § 3D1.2. Where the court determines that a group of counts are "closely-related," the defendant's offense level will be the offense level applicable to the count with the highest offense level in the group. § 3D1.3; *see United States v. Cusumano*, 943 F.2d 305, 312 (3d Cir.1991). Alternatively, where the court determines that a group of counts are not "closely-related," the defendant's offense level will be the offense level applicable to the count with the highest offense level, increased by varying levels for each additional offense, according to an enhancement table. § 3D1.4.

Counts are "closely-related" where the offenses involve "substantially the same harm." § 3D1.2. Section 3D1.2 provides in pertinent part:

All counts involving substantially the same harm shall be grouped together into a single Group.... Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan....

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) Counts are grouped together if the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Offenses covered by the following guidelines are specifically included under this subsection:

... 2F1.1; ... 2R1.1; ....

The offenses involved in this case, conspiring to submit non-competitive bids in violation of the antitrust laws and conspiring to make false statements to a federal agency, arise from separate transactions which cannot be grouped under § 3D1.2(a); nor does this case present a situation in which one of the counts embodies conduct that is the basis for a sentence enhancement as called for under § 3D1.2(c). Thus, our inquiry narrows to whether the offenses should be grouped under either subsection (b) or (d) of § 3D1.2.

a. *Section 3D1.2(b).*

Pursuant to § 3D1.2(b), counts involving "the same victim and two or more ... transactions *connected* by a common criminal objective or ... a common scheme or plan" should be grouped together. § 3D1.2(b) (emphasis added). The defendant argues that the antitrust charges and the false statement charges involved the same victim—the DPSC—and a common criminal objective—maximizing sales and profits for frozen fish products. We reject these arguments.

The defendant's offenses did not involve the same victim as required by § 3D1.2(b). The victim of an offense is the "one person who is directly and most seriously affected by the offense...." § 3D1.2, application note 2. The defendant argues that the DPSC was, as the government agency who received non-competitive bids and false statements, the "person ... most seriously affected" by these offenses. We disagree.

■■■ The question of who has been "most seriously affected" by an offense cannot be divorced from the interest invaded by an offense. All parties agree that the victim in the antitrust offense is the DPSC, acting on its own behalf as a market participant, since the conspiracy to rig bids deprived the agency of competitive bids, thereby increasing agency costs. In contrast, we found at sentencing that American fisherman and American fish processors were the victims[2] of the defendant's conspiracy to submit false statements.[3] Title 18 U.S.C. § 1001, prohibiting the submission of false statements to a government agency, was not designed to protect the DPSC from inferior quality fish, but was intended to ensure that DOD regulations, enacted for the benefit of society, would be implemented without interference. In this case, 18 U.S.C. § 1001 ensures that taxpayer funds ear-marked for American fisherman and American fish processors, i.e. the American economy, are not diverted to Canada. Accordingly, we find that since the defendant's offenses did not involve the same victim, § 3D1.2(b) is inapplicable.

Similarly, we find that the defendant's offenses are not "connected" by a common criminal objective, plan or scheme. While we do not doubt that both conspiracies were designed to maximize the defendant's sales and profits, the defendant failed to present any evidence that the conspiracies were connected or that he conspired to submit false statements to the DPSC in furtherance of the bid rigging conspiracy. Rather, all evidence suggests that the defendant's offenses were independent and distinct instances of criminal behavior involving different harms.

The antitrust conspiracy, from early 1981 until September 1989, was formed as part of a concerted action among a group of seafood processors to rig bids submitted to DPSC, in hopes of inflating market prices and increasing the *industry's* profits. In contrast, the conspiracy to submit false statements, from May 1986 until September 1989, was formed among Empire's employees in order to circumvent regulations

---

**2.** In many ways, a false statement offense is a "victimless" crime, a crime for which "society at large is the victim." § 3D1.2, application note 2. Submitting false statements to the government, in an effort to circumvent a regulation promulgated for the benefit of society at large, is akin to the victimless crimes of obstructing justice, stealing government documents, or illegally procuring food stamps. *See e.g. United States v. Egson*, 897 F.2d 353, 354 n. 2 (8th Cir.1990); *United States v. Berkowitz*, 712 F.Supp. 707, 710 (N.D.Ill.1989), *rev'd on other grounds*, 927 F.2d 1376 (7th Cir.1991). The victim for purposes of a victimless crime is "the societal interest that [has been] harmed." § 3D1.2, application note 2.

**3.** Even if we were to agree with the defendant that the DPSC was the victim of the false statement offense, the result would be the same. Circuits have held that, where the "victim" appears to be the United States, as represented by an agency, the victim is defined by the governmental interest which has been violated. *United States v. Reyes*, 908 F.2d 281, 289 (8th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991); *United States v. Kim*, 896 F.2d 678, 687 (2d Cir.1990). While we recognize that both *Reyes* and *Kim* involved offenses against the United States as represented by different government agencies, we see no reason why this reasoning should not apply to offenses against the United States, as represented by one government agency.

requiring that all DOD contracts be filled with fish of domestic origin, in hopes of increasing *Empire's* profits. There is no evidence that the conspiracies were anything but independent.[4] Each conspiracy evidences a separate culpable harm not proven to be part of a single ongoing plan of misconduct, and therefore, we have two separate, rather than "substantially similar," harms. Accordingly, we find that it would be inappropriate to group the defendant's offenses pursuant to § 3D1.2(b).[5]

b. *Section 3D1.2(d).*

The defendant argues that, since the fraud and antitrust provisions, §§ 2F1.1 and 2R1.1 respectively, are singled out in a list of offenses which are specifically susceptible to grouping, the plain meaning of § 3D1.2(d) requires that this court group the defendant's offenses. We disagree. While subsection (d) may provide a list of those offenses which are appropriate for grouping, the language of this subsection is precatory and not mandatory. *United States v. Ballard,* 919 F.2d 255, 257 (5th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 1429, 113 L.Ed.2d 481 (1991); *United States v. Egson,* 897 F.2d

353, 354 (8th Cir.1990); *United States v. Pope,* 871 F.2d 506, 510 n. 4 (5th Cir.1989) (each refusing to group offenses specifically enumerated in § 3D1.2(d)). Any grouping decision requires careful analysis of all the facts and circumstances.

Subsection (d) requires more than similar offense level calculations and more than ongoing or continuous offense behavior; there must be some link between defendant's offenses before grouping is appropriate. *United States v. Manuel,* 912 F.2d 204, 206–207 (8th Cir.1990). Having found, above in our discussion of § 3D1.2(b), that the defendant's fraud and antitrust violations do not even satisfy the primary requirement of § 3D1.2 that they involve "substantially the same harm," we cannot now group these offenses under subsection (d).[6] *Ballard,* 919 F.2d at 257.

c. *Computing Defendant's Combined Offense Level.*

Having found that it would be inappropriate to group the defendant's offenses under § 3D1.2, we must combine the defendant's offense levels pursuant to § 3D1.2. Section 3D1.4 directs that two (2) points be added to the count with the highest offense

4. Contrary to the defendant's assertions, the fact that each of the defendant's co-conspirators were also charged with conspiring to submit false statements is irrelevant. Although they faced similar charges, there is no evidence that the co-conspirators conspired with each other to make false statements. Rather, the co-conspirators conspired collectively to rig bids, and each co-conspirator conspired independently with his own company to make false statements.

5. *Accord United States v. Channel Fish Processing Co., Inc. et al.,* No. 91–00159 (E.D.Pa. July 25, 1991) and *United States v. Zaffiro,* No. 91–00158 (E.D.Pa. September 27, 1991) (related cases in which the court refused to group the antitrust and false statement offenses, pursuant to § 3D1.2(b), in sentencing defendant's co-conspirators); *contra United States v. F.J. O'Hara & Sons, Inc.,* Nos. 90–00026–B and 90–00027–B, 1991 WL 286175 (D.Me. September 13, 1991) (a related case finding that the two offenses, although separate, were part of the defendant's

scheme to sell fish to DPSC—as much fish product as he could at the greatest possible profit to his company). For the reasons discussed above we believe that the reasoning of *Channel Fish* and *Zaffiro* is most persuasive.

6. Even if we were to consider the language of § 3D1.2(d) more closely, we find that the defendant's base offense levels are not calculated in a similar way nor was his behavior ongoing and continuous. While both offense levels are determined monetarily, the severity of the antitrust offense is measured by the total volume of commerce attributable to the bid-rigging scheme and the severity of the fraud offense is measured by the amount of loss to the victim. Moreover, offenses resulting from continuous conduct can only be grouped if the offense guidelines specifically provide for upward adjustments in the offense level for repeated behavior. *United States v. Pilgrim Mkt. Corp.,* 944 F.2d 14, 19–20 (1st Cir.1991). There are no such adjustments under §§ 2F1.1 and 2R1.1.

level, resulting in this case in a combined offense level of thirteen (13).[7] Given the defendant's acceptance of responsibility, the offense level is adjusted downward two (2) levels, leaving a final offense level of eleven (11). § 3E1.1.

■ Having considered the history, character, and condition of the defendant as well as all potentially mitigating factors presented at the sentencing hearing,[8] we sentenced the defendant to twelve (12) months imprisonment, within a guideline range of eight (8) to fourteen (14) months.

■ While we recognize that the defendant has made significant amends for his offenses and has an exemplary reputation in the community, he was never-the-less the architect, along with Frank O'Hara, of a highly successful conspiracy to rig bids to the DPSC that lasted over eight years. The defendant was equally successful orchestrating a conspiracy to submit false statements to the Government. In an effort to make money at the expense of others, the defendant endangered the jobs of hundreds of employees, absconded tax-payer dollars, and endangered the already failing New England Economy. For these reasons, we find a split sentence of incarceration and home detention to be inappropri-

ate, and we sentence the defendant to twelve (12) months imprisonment.[9]

2. Computation of Appropriate Fine.

The defendant submits that the appropriate fine range for an antitrust offense is $20,000 to $250,000 as set forth in the text of 2R1.1(c).[10] We disagree. The parties have agreed that Empire's volume of commerce for the antitrust conspiracy was $15 million. Therefore, under the guidelines, the defendant faced a fine range of $600,000 to $1,500,000, that is, four to ten percent of the affected volume of commerce. Since a guideline range will only begin at $20,000 if four percent of the volume of commerce falls below this minimum, the $20,000 minimum is inapplicable to the defendant.

■ Since the maximum statutory fine for an individual under 15 U.S.C. § 1 is $350,000 and since no guideline fine can exceed the statutory maximum, we find that the appropriate fine range for the defendant's antitrust violation is $350,000. The defendant does not dispute that the appropriate fine range for the false statement offense is $500 to $5,000. § 5E1.2.

Having reviewed the defendant's financial condition and ability to pay, we imposed a fine of $50,000 on Count I and a fine of $5,000 on Count II.

7. 

Antitrust Violation:

| | | |
|---|---|---|
| Base offense level | 9 | § 2R1.1(a) |
| Bid Rigging | + 1 | § 2R1.1(b)(1) |
| Volume of Commerce | + 1 | § 2R1.1(b)(2) |
| Total | 11 | |

False Statement Offense:

| | | |
|---|---|---|
| Base offense level | 6 | § 2F1.1(a) |
| More than minimal planning | + 2 | § 2F1.1(b)(2) |
| Total | 8 | |

8. Defendant's counsel presented the following factors: the defendant was the second co-conspirator to accept responsibility for his offenses; the defendant arranged to sell his company so that ninety (90) percent of his employees could retain their jobs; all unsecured and secured creditors of the company have been paid; and the United States Government has been paid. Moreover, the defendant has primary responsibility for his aged father.

9. We are mindful that at least one goal of the guidelines is to minimize disparities in sentences. United States Sentencing Commission, *Guidelines Manual,* Part A (Introduction and General Application Principles). However, we find our sentence to be in keeping with those imposed on the defendant's co-conspirators. Judge Green, Eastern District of Pennsylvania, sentenced John Zaffiro, a minor player in the

conspiracy, to eight (8) non-split months. Judge Gawthrop, Eastern District of Pennsylvania, sentenced Roy Zaffiro, a more active participant, to ten (10) non-split months.

While Judge Hornby, District of Maine, sentenced John O'Hara, the defendant's ring-leader, to six (6) months, Judge Hornby's sentence was based largely on his decision to group the defendant's offenses under § 3D1.2, a decision we disagree with.

10. Section 2R1.1(c) provides in pertinent part:

The guideline fine range for an individual conspirator is from 4 to 10 percent of the volume of commerce, but not less than $20,000.

**1236**

### 3. Factual Objections.

The defendant raised five objections to the facts presented in the presentence report. Addendum to Presentence Report. These factual disputes have absolutely no bearing on our sentencing decision. Even if these five objections, concerning the identity and depth of participation of various co-conspirators (Nos. 2, 3), the alleged altruistic purpose of the conspiracy (No. 4), the exact length of the "breakdown" periods (No. 5), and the exact termination date of the conspiracy (No. 6), are warranted, they are irrelevant in the grand scheme of a highly successful bid rigging scheme that spanned a period of eight years.

There is no dispute that the conspiracy continued past November 1987, the effective date of the guidelines. There is no dispute as to the defendant's paramount role in the conspiracy nor as to the amount of commerce affected. And however altruistic the defendant's goals may have been, the law is the law. Accordingly, we find no material facts of the presentence report to be in dispute.

### CONCLUSION

Having reviewed the presentence report, each party's sentencing memoranda, and counsels' arguments, we find that (1) it is inappropriate to group the defendant's antitrust and fraud offenses pursuant to § 3D1.2; (2) under the guidelines, $250,000 is the appropriate fine for the defendant's antitrust violation; and (3) the defendant's factual objections are not material to our sentencing decision.