991 F.2d 806
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jesus Antonio ALVARADO-LOPEZ, Defendant-Appellant.
 No. 92-2165.
 United States Court of Appeals, Tenth Circuit.
 April 19, 1993.
 
 Before LOGAN, MOORE and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT*
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Jesus Antonio Alvarado-Lopez entered a conditional plea of guilty to a charge of re-entry into the United States after deportation, 8 U.S.C. § 1326(b)(1). He appeals the denial of motions to suppress and dismiss as well as the district court's refusal of his request for a downward departure. We affirm.
 
 
 2
 Senior Border Patrol Agent Stuart Woodside was advised by his superior that an informant claimed defendant Mr. Alvarado was illegally in the United States and living at a specific address in Organ, New Mexico. Assigned to verify that claim, Agent Woodside and his partner went to that address at 8:00 a.m on a December morning in 1991. When asked whether the purpose of his visit was to conduct a criminal or administrative investigation, he testified, "At that point it was administrative." He explained:
 
 
 3
 [W]ith the Immigration Service, oftentimes for illegal aliens we, [sic] they are dealt with administratively, meaning that when they are apprehended by Immigration agents they are oftentimes given an opportunity to return to Mexico voluntarily or for deportation proceedings. And at first we have to question the individuals to find out their status to make that determination of if [sic] they are here lawfully or not in the United States.
 
 
 4
 Upon arrival, Agent Woodside knocked on the door and was ultimately greeted by defendant's sister, Alma Carrasco. Agent Woodside told her he had information that illegal aliens were staying at her home, and he asked permission to speak to them. In particular, he told her he was looking for Jesus Antonio Alvarado-Lopez and his son. When asked what Ms. Carrasco said, the agent responded:
 
 
 5
 Well, she invited me in.... I spoke to her and asked her if Jesus Antonio Alvarado-Lopez was there again, and she said, yes, he was, that he was sleeping in a bedroom there. And I further asked at that time, "Is he here in the United States illegally?" And she told me yes. And thereafter she went to the bedroom where the defendant and his son were sleeping, and she knocked on the door and ... advised him that the Immigration was here to speak to him.
 
 
 6
 Defendant appeared after the agents waited for him to awaken and dress. Agent Woodside asked him whether he was Jesus Antonio Alvarado-Lopez, and defendant responded, "yes." The agent then asked him "if he had immigration documents, and he said he did not, he was here illegally."
 
 
 7
 Upon hearing that statement, Agent Woodside said, "I told him that he needed to accompany us.... then we left to go to the Border Patrol office."
 
 
 8
 During this entire time,[1] defendant was not physically restrained, but after Mr. Alvarado said he was in the country illegally, Agent Woodside did not believe Mr. Alvarado was free to leave.[2] Defendant was not arrested, however, until the agents returned with him to the Border Patrol station and determined by a computer check that Mr. Alvarado had a criminal history. Agent Woodside stated it was not until that time his focus changed from an administrative proceeding to a criminal case.[3]
 
 
 9
 Defendant moved to suppress his statement that he was illegally in this country on the ground that prior to interrogating him, Agent Woodside did not advise him of his Miranda rights.[4] The district court held that Miranda did not apply because the statement was made during "an administrative investigation." The court further found that the statement was made during "a consensual discussion;" therefore, the court did not believe it had to reach the question of whether defendant was detained when the admission was made.
 
 
 10
 Defendant argues in his brief that the distinction drawn by the district court between an administrative and a criminal interrogation is insignificant. He contends when questions are asked that will likely elicit an incriminating response, the interrogator must comply with Miranda.
 
 
 11
 We think several factors are dispositive. First, the district court found the interrogation occurred during a consensual confrontation. That is tantamount to a finding that questioning did not occur during a custodial setting. The conclusion is justified because the agents were freely admitted into the home of defendant's sister, defendant was allowed to dress before talking to the agents, he was not menaced in any way, nor was he under any form of duress when he volunteered his response.[5] Moreover, there is a significant fact which grows from the Administrative-Criminal distinction.
 
 
 12
 One key to the application of Miranda is the expectation that questioning will, or might, produce incriminating responses. That expectation is not present here because the officers were not even considering criminal charges against Mr. Alvarado at the time Agent Woodside asked him if he had "immigration documents." Remembering the agent placed little credence in information furnished by the unidentified informant, it is evident that the only concern the agents had was whether to place defendant in custody for the purpose of deporting him. Therefore, when defendant's response was made, the officers did not believe it was incriminating. It was not until after they officially determined he had a criminal history that the agents realized the potential of criminal charges against Mr. Alvarado. Although defendant relies upon United States v. Mata-Abundiz, 717 F.2d 1277 (9th Cir.1983), for the proposition that the agent's civil investigation does not obviate the necessity for a pre-questioning advisement of rights, the case is inapposite and not compelling.
 
 
 13
 In a major and critical way Mata is distinguishable because the defendant was in jail on state charges when he told INS agents he was a Mexican citizen. Although the INS investigator characterized his questioning as a "routine, civil investigation," the Ninth Circuit held Miranda applied solely because the defendant was in custody when the statement was made. This fact made the civil-criminal distinction irrelevant, See Mathis v. United States, 391 U.S. 1 (1968).
 
 
 14
 Here, defendant was in his residence, neither in custody on criminal charges nor under suspicion of criminal activity, when he volunteered his illegal alien status. While that admission subjected him to ensuing custody for the purpose of deportation, it did not place him in the custodial setting which prompted the Miranda rule. In fact, even conceding Agent Woodside would not have let defendant free after that admission, it is clear defendant was not even under the civil deportation constraint until after he volunteered his alien status. On this record, we can see no reason to hold a Miranda warning was necessary.
 
 
 15
 Defendant next attacks the validity of the first deportation proceeding which made him subject to criminal prosecution in this case. He contends that proceeding was fundamentally unfair because the immigration judge who ordered deportation did not follow Immigration and Naturalization Service rules during the pre-deportation hearing. Specifically, defendant argues the immigration judge did not inform defendant of the availability of free legal services as required by 8 C.F.R. § 242.16(a) (1989). Although the judge did advise defendant of all the rights guaranteed to him under the Constitution, defendant contends the failure to comply with the rule resulted in the deprivation of due process. Consequently, defendant concludes, the indictment should have been dismissed or the evidence of his deportation suppressed because of this "flaw" in the deportation proceeding.
 
 
 16
 Notwithstanding the evident lack of compliance with INS regulations, defendant must still show he was prejudiced by the failure before he can establish grounds for claiming a denial of fundamental fairness. United States v. Valdez, 917 F.2d 466, 468 (10th Cir.1990). As in Valdez, defendant urges the prejudice he suffered was the failure to follow regulations. He distinguishes Valdez, however, because in that case we held the immigration judge followed all the required regulations. He asserts the failure to do so in this case amounts to per se prejudice.
 
 
 17
 We do not read the Valdez holding with the same generosity.[6] We noted in that case there was no indication that the defendant was deprived of his right to appeal the deportation order as a consequence of the asserted default in due process. Consequently, we concluded the defendant sustained no resultant prejudice.
 
 
 18
 Defendant offered no evidence to suggest that the failure to furnish him with a list of free legal services resulted in a prejudicial consequence. He did not, for example, demonstrate that he proceeded with the deportation hearing although he wanted the advice of counsel or that he wanted to appeal but was deprived of the opportunity because he did not have the service of counsel. Although he speculates in his brief how prejudice might have occurred, he presented no such evidence to the district court. Consequently, defendant failed to establish the necessary element of prejudice to carry the day.
 
 
 19
 Finally, defendant argues the district court erred by refusing his request for downward departure. Recognizing we have held again and again we do not have jurisdiction to review denials of downward departure, See United States v. Soto, 918 F.2d 882, 885 (10th Cir.1990), defendant tries to avoid the rule by contending it is unclear whether the district court knew it could depart downward in this case. We think the lack of clarity exists only in counsel's spirited advocacy.
 
 
 20
 We have no doubt that the district judge denied downward departure with full knowledge of his authority. The fact that he did so with dispatch and without mention of defendant's request is not indicia of the court's ignorance or misunderstanding.
 
 
 21
 AFFIRMED. The mandate shall issue forthwith.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 From entry to departure, the agents were in the residence "about five minutes."
 
 
 [2]
 Under the circumstances, that fact is problematical inasmuch as Mr. Alvarado was in his own residence at the time. Indeed, the evidence does not suggest he was anxious to go anywhere else. Nonetheless, it is indisputable Agent Woodside thought defendant could not have walked out the door on his own volition
 
 
 [3]
 On cross examination, Agent Woodside admitted before he even encountered defendant he was aware that the informant claimed Mr. Alvarado had served time in prison. However he explained, in effect, he did not attach significance to that claim because informants are often mistaken or inclined to misstate facts for reasons of their own. Therefore, he would not act upon the claim until he had independently verified it
 
 
 [4]
 In light of his sister's statement, the evidentiary significance of the admission is not disclosed by defendant. Moreover, we assume the government could produce evidence of defendant's illegal status through independent sources without having to depend upon defendant's admission. It is therefore difficult to perceive this as anything but an academic issue
 
 
 [5]
 We recognize these facts were disputed by defendant's sister, but the district court heard the testimony and chose not to believe her. We cannot overrule that choice, because the question of credibility is for the district court alone. Suffice, then, that the district court's findings are based on the testimony of the agents, and those findings are amply supported by the evidence
 
 
 [6]
 Defendant claims that in Valdez we "surreptitiously" concluded a failure to follow administrative rules is different from a "violation of fundamental due process rights." We see nothing stealthy about the Valdez holding. Perhaps defendant's exuberance for his cause has influenced his unfortunate choice of words. Contrary to defendant's suggestion of our clandestine motives, the case forthrightly stands for the proposition that a defendant collaterally attacking the fundamental fairness of a deportation hearing as a ground for setting aside a subsequent conviction for re-entering after deportation must establish he was prejudiced by the claimed unfairness