**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jesus MATA–ABUNDIZ,
Defendant-Appellant.**

**No. 83–3046.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 6, 1983.

Decided Oct. 4, 1983.

Robert S. Linnell, Asst. U.S. Atty., Yakima, Wash., for plaintiff-appellee.

Paul D. Edmondson, Yakima, Wash., for defendant-appellant.

Before WRIGHT, PREGERSON and FERGUSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Mata-Abundiz was convicted of possession of a firearm by an illegal alien. At trial, the only evidence of Mata's alienage was his admission to a criminal investigator for the Immigration and Naturalization Service (INS) that he was a citizen of Mexico. Mata made the statement while he was jailed on state charges. He was not given *Miranda* warnings. The question presented is whether the investigator's failure to give Mata the *Miranda* warnings makes the answers inadmissible in a subsequent criminal prosecution. We conclude that it does and reverse the conviction.

## I. FACTS

Mata was arrested and charged with a violation of state statutes against carrying a concealed weapon and possession of a firearm by an alien. He was confined in the county jail in Yakima, Washington.

Ten days later, DeWitt, an experienced INS criminal investigator, visited Mata at the jail to obtain biographical information about Mata's immigration status. DeWitt characterized the visit as a routine, civil investigation. He had access to Mata's booking information and was aware of the state firearms charges. DeWitt gave no *Miranda* warnings during the interview. When he asked Mata about his citizenship, Mata responded that he was a citizen of Mexico.

DeWitt returned to his office and made further inquiries into Mata's immigration status. Within three hours, DeWitt returned to the jail with a warrant for Mata's arrest. As a "second thought," DeWitt gave Mata the *Miranda* warnings and interrogated him about the state firearms charges. Federal charges of possession of a firearm by an illegal alien, 18 U.S.C.App. § 1202 (1976), were filed several days later.

At trial, Mata's unwarned statement to DeWitt was admitted over objection. It was the only evidence presented to show Mata's alienage and was an essential element needed for conviction. Mata was convicted and sentenced.

## II. DISCUSSION

■ *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prohibits "custodial interrogation" unless the government first gives warnings to the suspect. Not every question asked in a custodial setting constitutes "interrogation." *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1981). The test is whether "under all of

the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)).

### A. The Asserted Distinction Between Civil and Criminal Investigations

■ The trial court ruled that DeWitt's questioning was not interrogation because it occurred during a civil, rather than a criminal, investigation. This distinction between civil and criminal investigations in a custodial setting was, however, decisively rejected by the Supreme Court in *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

In *Mathis,* the Supreme Court held that self-incriminating statements given by a jailed defendant to a revenue agent during a routine tax investigation were inadmissible in a criminal tax fraud prosecution because the agent had failed to give *Miranda* warnings. The arguments rejected in *Mathis* are virtually identical to the arguments advanced here. The *Mathis* court stated:

> The government here seeks to escape application of the *Miranda* warnings on two arguments: (1) that these questions were asked as part of a routine tax investigation where no criminal proceedings might even be brought; and (2) that the petitioner had not been put in jail by the officers questioning him, but was there for an entirely separate offense. These differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody.

*Id.* at 4, 88 S.Ct. at 1504–1505.

The *Mathis* Court noted that civil tax investigations often result in criminal prosecutions. *Id.* It emphasized that full-fledged criminal investigations began within eight days of the last visit of the revenue agent to the jail. *Id.* It concluded that the revenue agent should have given *Miranda* warnings at the initiation of the custodial questioning.

The facts here show the need for *Miranda* warnings in "civil" custodial investigations even more vividly than did those in *Mathis.* Mata was jailed on state firearms charges. As an INS criminal investigator with 23 years of investigative experience, DeWitt knew that evidence of alienage, coupled with the evidence of firearms possession, could lead to federal prosecution under 18 U.S.C.App. § 1202. He had reason to know that any admission of alienage by Mata would be highly incriminating.

DeWitt's actions immediately after the unwarned statement strengthen the inference that he already contemplated criminal prosecution at the time of the first interview. He returned to his office to check INS records for evidence of Mata's status. Finding none, he immediately obtained a warrant for Mata's arrest. By any reckoning, full-fledged criminal investigations began no later than three hours after Mata's unwarned statement. This is much shorter than the eight days that the Court found significant in *Mathis.*

■ The trial court stated that the initial civil questioning was not a subterfuge to avoid the need to give *Miranda* warnings. It did not make any inquiries or findings of fact regarding that assertion. The close sequence of "civil" investigation and criminal prosecution raises the possibility that the initial investigation was both civil and criminal. If civil investigations by the INS were excluded from the *Miranda* rule, INS agents could evade that rule by labeling all investigations as civil. Civil as well as criminal interrogation of in-custody defendants by INS investigators should generally be accompanied by the *Miranda* warnings.

■ This does not mean that admissions obtained in civil investigations of in-custody suspects can never be used in criminal prosecutions, unless the investigator first gives warnings. The question here, as in other contexts, turns on whether there was "interrogation" within the meaning of *Miranda.* If an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* vi-

olation. Not all civil questioning constitutes interrogation. We simply follow *Mathis* in holding that the investigator cannot control the constitutional question by placing a "civil" label on the investigation.

### B. *The Exception for Routine Booking Procedures*

The government contends that DeWitt's questioning falls within the exception to the *Miranda* requirements for routine background questioning attendant to arrest and booking. *See United States v. Thierman,* 678 F.2d 1331, 1334 (9th Cir. 1982); *United States v. Booth,* 669 F.2d 1231, 1237–38 (9th Cir.1981).

In *Booth,* we explained this exception for routine booking procedures and noted that it arises because background questions rarely elicit an incriminating response. *United States v. Booth,* 669 F.2d at 1238. If, however, the questions are reasonably likely to elicit an incriminating response in a particular situation, the exception does not apply. *Id.* As we stated in *Booth:*

> Ordinarily, the routine gathering of background, biographical data will not constitute interrogation. Yet we recognize the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect.

*Id.* (citations omitted). The test is objective. The subjective intent of the agent is relevant but not conclusive. *Id.* The relationship of the question asked to the crime suspected is highly relevant. *Id.*

In this case, the questioning conducted by Investigator DeWitt was reasonably likely to elicit an incriminating response from Mata. The "background questions" asked related directly to an element of a crime that DeWitt had reason to suspect. DeWitt's intent in asking the questions is inconclusive. *Id.* Because his questioning was highly likely to elicit incriminating information from Mata, it constituted interrogation under the objective *Booth* standard.

Moreover, the questioning conducted by Investigator DeWitt had little, if any, resemblance to routine booking procedures.

As the District of Columbia Circuit noted in *United States v. Hinckley,* 672 F.2d 115, 122–23 (1982), booking is essentially a clerical procedure, occurring soon after the suspect arrives at the police station. The *Hinckley* court emphasized three factors, all present here, that indicated that the challenged questioning was not booking: (1) the government agency involved does not ordinarily book suspects, (2) a true booking had already occurred and the agency had access to the information obtained, and (3) the questioning occurred well after the suspect was placed in custody (in *Hinckley,* five hours; here, 10 days). *Id.* These factors lead us to conclude that any analogy to routine booking procedures is unwarranted.

### III. CONCLUSION

We hold that in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response. Investigator DeWitt's question regarding Mata's citizenship was very likely to produce an incriminating response. DeWitt had a duty to warn Mata before questioning him about his citizenship. The conviction is reversed.