**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Francisco SALGADO, aka Francisco Delgado–Salgado aka Jorge Ramirez Martinez aka Jorge Martinez Ramirez aka Brigado Salgado Delgado, Defendant–Appellant.**

No. 00–50346.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 2002.

Filed June 21, 2002.

Maria E. Stratton, Federal Public Defender, Los Angeles, CA, for the defendant-appellant.

Tammy C. Spertus, Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Before: PREGERSON, RYMER and T.G. NELSON, Circuit Judges.

Opinion by Judge RYMER; Dissent by Judge PREGERSON.

RYMER, Circuit Judge.

Francisco Salgado appeals his conviction pursuant to a conditional guilty plea to one count of being an illegal alien found in the United States following deportation in violation of 8 U.S.C. § 1326. The district court denied a motion to suppress statements that Salgado made about his birth and citizenship to a civil investigative agent of the Immigration and Naturalization Service (INS) while he was incarcerated in the Orange County Jail on charges unrelated to his immigration status, and to an Orange County Police Officer when he was arrested (again on charges unrelated to his immigration status) after being deported and reentering the United States. We affirm.

I

Salgado was arrested on a state weapons charge and was housed at the Orange County Jail facility. Immigration Enforcement Officer Isley Lundgren was referred to Salgado by Orange County sheriff deputies because Salgado had indicated that he was born in a country other than the United States in the booking process. She interviewed Salgado on March 31, 1998 to determine whether he was subject to an administrative action for deportation. Lundgren asked his name, address, occupation, place of birth, parents' place of birth and nationality, and country of citizenship. Salgado stated that he was a citizen and national of Mexico, that he was born in Tehuixtla, Morelos, Mexico, and that his parents had been born in Mexico and were Mexican nationals. He also said that he entered the United States without documentation or inspection near the San Ysidro, California Port of Entry in June 1992. Lundgren recorded Salgado's responses on a Record of Deportable/Inadmissible Alien form (Form I–213). Lundgren knew that INS criminal investigators would have access to the Form I–213s that she completed, but she had no role in determining whether any particular individual would be prosecuted for violation of the federal immigration laws. She had an INS detainer placed on Salgado so that he would be transferred to INS custody at the completion of whatever time he served in state custody. Lundgren determined that Salgado had an A–File (an immigration file maintained by the INS on aliens), and she put the INS detainer, her Form I–213, and an I–265 form (request for Notice to Appear before an Immigration Judge for a hearing on deportation) in it. Lundgren did not give *Miranda*[1] warnings to Salgado before the interview. Salgado was in fact deported to Mexico on May 30, 1998.

On June 21, 1999, Salgado was arrested and booked into the Orange County Jail on two outstanding misdemeanor warrants for drawing a deadly weapon and for riding a bicycle under the influence. Officer David Holz of the Orange Police Department was the arresting officer. As part of the routine booking process, Holz asked Salgado a number of questions including his address, occupation, marital status, social security number, telephone number, place of birth, and country of citizenship. Salgado said that he was born in Mexico and was a Mexican citizen.

In August 1999 INS Special Agent Lonnie Wilson reviewed Salgado's A–File, which disclosed five Records of Deportable Alien and one Warrant of Removal/Deportation indicating that he had previously been deported. It also contained certified copies of a number of prior convictions. Wilson ran a fingerprint comparison of the prints in the A–File and those taken at the time of Salgado's arrest, which confirmed that they were of the same person. He sought to interview Salgado, who was by

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

then in INS custody. Wilson gave Salgado *Miranda* warnings and a Consular Notification, Salgado invoked his right to counsel, and the interview ended. Wilson arrested him for being found in the United States without permission after previously being deported, in violation of 8 U.S.C. § 1326.

Salgado was indicted, and moved to suppress his statements to Lundgren and Holz. Following an evidentiary hearing, the district court found that Lundgren's sole purpose in eliciting Salgado's biographical information was to determine if he were subject to an administrative action for deportation. Further, it found that there was no evidence that Salgado was suspected of a crime to which his nationality was relevant at the time of the interview, and that Lundgren could not reasonably anticipate the future incriminating quality of the statements that she elicited. The court found that Holz asked Salgado questions concerning his place of birth and citizenship as part of the routine booking process, and that they sought nothing more than routine booking information of the kind that is rarely incriminating. Therefore, the court held that the interviews were not custodial interrogation subject to *Miranda.*

Salgado timely appealed the issue preserved by his conditional plea.

## II

■■■ "The test to determine whether questioning is 'interrogation' within the meaning of *Miranda* is whether 'under all of the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect." ' " *United States v. Solano–Godines,* 120 F.3d 957, 961 (9th Cir.1997) (quoting *United States v. Mata–Abundiz,* 717 F.2d 1277, 1278–79 (9th Cir.1983) (quoting *United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir.1981) (quoting *Rhode*

*Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)))). Salgado argues that in a prosecution for violating the immigration laws, questions regarding birthplace and citizenship are very likely to produce such a response. He contends that this is particularly so because he speaks only Spanish and was arrested in Orange County, approximately 100 miles from the Mexican border.

*If* Salgado had been interviewed in connection with a "prosecution for violating the immigration laws," or *if* Salgado had been in custody on charges relating to his immigration status, *then* questions about birthplace and citizenship might have been reasonably likely to elicit an incriminating response in which case he should have been *Mirandized* before-hand. We so held in *Mata–Abundiz.* But that is not this case.

The Lundgren interview occurred on March 31, 1998 when Salgado was in jail on state charges for crimes having nothing to do with his status as an alien. Lundgren was an INS agent handling civil immigration matters; her inquiries of Salgado were routine. Although the interview occurred at the jail, it was solely for the administrative purpose of determining whether Salgado was deportable when he got out of jail. Lundgren had no reason to believe that Salgado's statements would be incriminating. She did not refer Salgado (or any other alien whom she interviewed and who turned out to be undocumented) to the criminal branch of the INS for investigation or to law enforcement for prosecution. All she did was place an INS detainer on Salgado to make sure that he appeared before an immigration judge after his incarceration. Salgado was in fact deported on May 30, 1998. The problem is, he reentered the United States illegally and got arrested on June 21, 1999, again on unrelated state charges. Lundgren had

no reason to believe that this would happen.

■ As the district court concluded, this case is quite similar to *Solano–Godines*. There, two years before the government brought criminal charges of illegal reentry after deportation, the defendant appeared at a deportation hearing and responded to questioning by the immigration judge. Like Salgado, Solano–Godines made statements about his place of birth, citizenship, prior convictions, and prior lawful deportations without having been given a *Miranda* warning. He argued that the statements should be suppressed because they might have been incriminating. However, we held that the statements were not obtained in violation of *Miranda*. "*Miranda* warnings are not required before questioning in the context of a civil deportation hearing ... because deportation proceedings are not criminal prosecutions, but are civil in nature." *Solano–Godines*, 120 F.3d at 960. We thought that the immigration judge's questions were not reasonably likely to elicit an incriminating response, and thus that Solano–Godines was not interrogated within the meaning of *Miranda*. As we explained, "[t]he immigration judge could not be expected to anticipate that two years later Solano would illegally reenter the United States and that his responses to questions at his civil deportation hearing might incriminate him in a prosecution for this future crime." *Id.* at 962.

Salgado contends that *Solano–Godines* is distinguishable because the questioning there was conducted during an actual deportation hearing, after the INS had decided not to prosecute the defendant for immigration offenses. Here, by contrast, Salgado argues that Lundgren's questioning occurred during the investigation stage of the case, which is different from an immigration judge speculating that a deportee may return to the United States and face criminal prosecution for illegal reentry sometime in the future. We disagree. The Lundgren interview did not take place during the "investigation" stage of the crime for which Salgado is convicted in this case. He was suspected at the time of the interview only of having committed state misdemeanors that had nothing to do with his immigration status. He was deported—not prosecuted. While we do not suppose that Lundgren is naive or that the possibility that a deported alien might return and might get in trouble again never occurred to her, there is no evidence that she could (or did) reasonably believe that Salgado could be incriminating himself on account of the likelihood that he would reenter illegally and commit more crimes a year later. The same is no doubt true of the immigration judge in *Solano–Godines*. In any event, the district court found that Lundgren could not reasonably anticipate the future incriminating quality of the statements that she elicited, and we are not firmly convinced this is wrong.

■ Salgado maintains that *Mata–Abundiz* should control instead of *Solano–Godines*. Again, we disagree. In *Mata–Abundiz*, an INS criminal investigator questioned Mata while he was in jail on state criminal charges that included possession of a firearm by an illegal alien. This gave the investigator reason to know that evidence of alienage, together with evidence of firearms possession, could lead to federal prosecution under 18 U.S.C. § 1202. Thus, the agent's inquiry about citizenship related directly to an element of the crime which the investigator had reason to suspect that Mata had committed. Nevertheless, he gave no *Miranda* warnings. The agent immediately began a full-fledged criminal investigation and returned to the jail within three hours with a warrant for Mata's arrest on federal charges. Mata's statement to the agent

about alienage was the only evidence presented on that issue at trial. In these circumstances, we held that the investigator had reason to know that his questions were likely to elicit incriminating information relating to a federal prosecution for illegal possession of a firearm by an alien. But we also made it clear that "[t]his does not mean that admissions obtained in civil investigations of in-custody suspects can never be used in criminal prosecutions, unless the investigator first gives warnings." *Mata–Abundiz*, 717 F.2d at 1279. Rather, "[i]f an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation." *Id.*

The only difference between this case and *Solano–Godines* is that Salgado was in jail whereas Solano was at a hearing. However, in neither case could the questioner have reasonably suspected that the question was likely to elicit an incriminating response. In each, the response became incriminating only after the passage of a substantial period of time and after the defendant had been deported, had illegally reentered the country, and had been arrested on state charges unrelated to his immigration status. By the same token, *Solano–Godines* and *Salgado* both differ from *Mata–Abundiz* in that unlike *Mata–Abundiz*, the person asking questions did not know from pending state charges that a federal criminal prosecution relevant to nationality could result; they did not refer the alien for criminal investigation or initiate one themselves; and the defendants were not prosecuted forthwith on federal immigration charges.

Thus, the rationale in *Solano–Godines* applies. We are not persuaded to hold otherwise just because Salgado was housed close to the border, or speaks Spanish. Neither factor reasonably makes it more likely that Lundgren should have

anticipated that Salgado would reenter the country illegally after being deported, would commit more crimes, and would get caught by local law enforcement officers a year later. We therefore affirm the district court's ruling that Lundgren's interview was not interrogation and that there was no *Miranda* violation.

 Salgado also challenges the court's refusal to suppress statements of alienage that he made to Officer Holz as part of the booking process at the Orange County Jail when he was arrested June 21, 1999 on outstanding state warrants. His theory is that the Jail was in effect acting as an agent of the INS. However, having heard Holz testify, the district court found that his questions sought nothing more than routine booking information of the kind that is rarely incriminating. The court also found that none of the circumstances existing in *Mata–Abundiz*, 717 F.2d at 1280, existed in Holz's case. In *Mata–Abundiz*, we held that the routine booking exception to *Miranda* did not apply, primarily because the background questions that the agent asked there related directly to an element of a crime that the agent had reason to suspect. In addition, we noted that the INS—for whom the agent was a criminal investigator—does not ordinarily do bookings, that a true booking had already occurred to which the INS had access, and that the INS questioning occurred well after the suspect was placed in custody. Here, of course, Holz was an Orange police officer, not a criminal investigator for the INS, and there is no question that his was a "true" booking. We decline to impute to Holz knowledge that he did not have at the time—that later Salgado would be prosecuted on immigration charges—or a purpose that he did not have—to ask booking questions on behalf of the INS. In any event, given that the 1998 statements of alienage which Sal-

gado made to Lundgren are admissible, any error in failing to suppress Salgado's 1999 statements to Holz would be harmless.

AFFIRMED.

PREGERSON, Circuit Judge, dissenting.

I believe that Salgado's un-Mirandized statements to INS Agent Lundgren and Police Officer Holz should have been suppressed because they were the result of custodial interrogation. Accordingly, I dissent.

The majority correctly recites the test for determining whether questioning is interrogation within the meaning of *Miranda:* "whether under all of the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect." *Solano–Godines,* 120 F.3d at 961 (citations omitted). However, the majority by-passes what I regard as the most critical fact in this case: INS Agent Lundgren's and Police Officer Holz's questioning was the product of a cooperative arrangement between the INS and the Orange County Jail ("Jail"), the purpose of which was to identify Jail detainees who were in the United States illegally and facilitate the initiation of civil and criminal INS proceedings against them.

The cooperative arrangement worked as follows. Jail detainees were asked about their place of birth and country of citizenship during the Jail's routine booking process. When a detainee responded that he was born outside the United States and was not a United States citizen, he was immediately referred to INS agents who were stationed and had offices at the Jail. An INS agent would then ask the detainee about his place of birth, country of citizenship, manner of entry into the United States, and the length of time he had been in the United States. The INS agent would record the detainee's responses to these questions on a form that was reviewed by agents in the criminal prosecutions unit of the INS. Based in part on the information on that form, agents in the criminal prosecutions unit of the INS would decide whether to initiate criminal proceedings against the detainee.

INS Agent Lundgren was stationed at the Jail as part of this cooperative arrangement. She questioned Salgado after Salgado's responses to the Jail's booking questions suggested that he might be in the United States illegally. Because of the cooperative arrangement between the INS and the Jail, INS Agent Lundgren knew—from reading Salgado's responses to the questions on the Jail's booking form—that Salgado was born in Mexico, that he was a Mexican citizen, and that he spoke only Spanish. INS Agent Lundgren also knew that Salgado's answers to her questions would be reviewed by agents in the criminal prosecutions unit of the INS. Finally, INS Agent Lundgren knew, or reasonably should have known, that Salgado's responses to her questions about his place of birth, citizenship, manner of entry into the United States, and the length of time that he had been in the United States could be used against him in criminal prosecutions for illegal entry[1] and illegal reentry following deportation (the offense Salgado was ultimately convicted of committing).

1. 8 U.S.C. § 1325 provides that "[a]ny alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers ... shall, for the first commission of any such offense, be fined under Title 18 or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under Title 18, or imprisoned not more than 2 years, or both."

We have held that "in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response." *Mata–Abundiz*, 717 F.2d at 1280. Under these circumstances, I believe that INS Agent Lundgren's questioning was reasonably likely to incriminate Salgado and, thus, constituted interrogation.

The majority relies heavily on our decision in *Solano–Godines* in support of its conclusion that INS Agent Lundgren's questions were not interrogation. In *Solano–Godines*, we held that an Immigration Judge need not give *Miranda* warnings before questioning a detainee at a civil deportation hearing because "[t]he immigration judge could not be expected to anticipate that two years later [the defendant] would illegally reenter the United States and that his responses to questions at his civil deportation hearing might incriminate him in a prosecution for this future crime." *Solano–Godines*, 120 F.3d at 962.

Because the circumstances of *Solano–Godines* are significantly different from those in this case, our conclusion in *Solano–Godines* should not control here. While the Immigration Judge's questions in *Solano–Godines* were asked during a civil deportation hearing, INS Agent Lundgren's questions were asked as part of an ongoing INS investigation which was intended to uncover violators of immigration laws. INS Agent Lundgren knew that Salgado's statements would be reviewed by agents in the criminal prosecutions unit of the INS, and that Salgado's admissions to INS Agent Lundgren—that he entered the United States illegally and had remained in the United States for over one year—could immediately have been used to prosecute Salgado for illegal entry.

I find it inconsequential to this analysis that the statements INS Agent Lundgren elicited from Salgado were not used against Salgado until over a year later, when he illegally reentered the United States. The test is whether INS Agent Lundgren's questions were "reasonably likely to elicit an incriminating response" *when they were asked,* not whether or when Salgado's incriminating responses to INS Agent Lundgren's questions were ultimately used against him. *Innis*, 446 U.S. at 301, 100 S.Ct. 1682. INS Agent Lundgren's questions constituted interrogation because Salgado's admissions to INS Agent Lundgren—that he was a Mexican citizen who had entered the United States illegally and had remained in the United States for over one year—could have been used against him in a criminal prosecution for illegal entry *as soon as they were uttered.*

I further find it inconsequential that INS Agent Lundgren was a "civil" investigator who had no role in determining whether Salgado would be criminally prosecuted. Criminal INS investigators had access to all of the information gathered through "civil" interviews at the Jail, and INS Agent Lundgren knew that Salgado's statements to her would be placed in a file that was reviewed by a criminal INS investigator and could serve as admissions in a criminal prosecution. As we have observed, "[c]ivil as well as criminal interrogation of in-custody defendants by INS investigators should generally be accompanied by the *Miranda* warnings," and the INS cannot insulate agents from the obligation to give *Miranda* warnings "by placing a 'civil' label on the investigation." *Mata–Abundiz*, 717 F.2d at 1279–80.

Finally, I find it inconsequential that Salgado was detained at the Jail on a misdemeanor weapons charge, and not an immigration violation, when he was interviewed by INS Agent Lundgren. The very purpose of the cooperative arrange-

ment between the INS and the Jail was to give the INS information about and access to Jail detainees who were reasonably likely to be in violation of immigration laws, even though they were not arrested or detained at the Jail for those immigration violations. In this case, INS Agent Lundgren interviewed Salgado because Salgado had indicated, during the Jail's booking process for the misdemeanor weapons charge, that he was born in Mexico and was a Mexican citizen. Thus, because of this cooperative arrangement between the INS and the Jail, INS Agent Lundgren had information about Salgado—independent of the basis for his arrest—that made her questions "reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682.

In sum, having considered *all* of the circumstances of this case, I find that INS Agent Lundgren's questions were reasonably likely to elicit an incriminating response from Salgado, and therefore conclude that INS Agent Lundgren should have given Salgado *Miranda* warnings before questioning him.

I also find that Police Officer Holz's questions about Salgado's place of birth and citizenship, asked as part of the Jail's booking process, constituted custodial interrogation. We have recognized that routine booking questions will constitute custodial interrogation "where the elicitation of information regarding immigration status is reasonably likely to inculpate the respondent." *United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1046 (9th Cir. 1990). Police Officer Holz's questioning

amounted to custodial interrogation that was "reasonably likely to inculpate" Salgado because the Jail's standard booking questions about Salgado's immigration status and place of birth were the first phase of the cooperative arrangement between the Jail and the INS that directly led to Salgado's criminal prosecution for illegal reentry.[2] *Id.* Accordingly, I would find that Police Officer Holz should have given Salgado *Miranda* warnings before questioning him.

---

**2.** After Police Officer Holz asked Salgado the Jail's standard booking questions and Salgado identified himself as a Mexican citizen who was born in Mexico, Salgado was referred to INS Agent Haroldsen, who was stationed at the Jail. INS Agent Haroldsen asked Salgado the same questions asked by INS Agent Lundgren, and Salgado gave the same answers—including that he entered the United States

without inspection, and that he had been in the United States illegally for over one year. Based in part on Salgado's admissions to INS Agent Haroldsen, Salgado was referred to INS Agent Wilson in the criminal prosecutions unit of the INS. Shortly thereafter, INS Agent Wilson arrested Salgado for illegal reentry following deportation.