**UNITED STATES of America,
Plaintiff,**

v.

**Jaime TREJO–ISLAS, Defendant.**

**No. 2:02CR0151S.**

United States District Court,
D. Utah,
Central Division.

Aug. 14, 2002.

Paul M. Warner, United States Attorney, Salt Lake City, UT, Bill Ryan, Assistant United States Attorney, Dave Backman, Assistant United States Attorney, for Plaintiff.

Mary C. Corporon, Corporon & Williams PC, Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION

SAM, Senior District Judge.

Before the court is a motion to suppress evidence submitted by defendant Jaime Trejo–Islas. By this motion, defendant seeks to suppress all post-arrest statements he made on the grounds that such statements resulted from custodial interrogation in coercive circumstances and/or were obtained in violation of his constitutional and *Miranda* rights. On June 12, 2002, the court conducted an evidentiary hearing to address defendant's motion. Present were Mary C. Corporon, Esq., representing defendant, and David F. Backman, Esq. and William C. Ryan, Esq., Assistant United States Attorneys, representing plaintiff United States of America. At the conclusion of the hearing, the court set forth a schedule for supplemental briefing to be filed by counsel, based upon the evidence presented. In a telephone conference with counsel on or about July 26, 2002, the court, having reviewed and carefully considered counsels' memoranda and the evidence presented at the hearing, orally ruled in defendant's favor and granted his motion to suppress. This Memorandum Decision serves to memorialize the court's ruling for the record.

### I. FINDINGS OF FACT

On March 24, 2002, at approximately 5:10 a.m., defendant was allegedly a passenger in a Chevrolet Suburban which rolled over several times during a traffic accident. The indictment alleges that de-

fendant was the registered owner of the vehicle, all of the vehicle's occupants were illegal aliens, and defendant was aiding and/or abetting the crime of transporting illegal immigrants when the accident occurred. Following the accident, defendant was transported by ambulance to St. Mary's Hospital in Grand Junction, Colorado.

At approximately 6:15 or 6:30 a.m., Special Agent Kris Schaufelberger of Immigration and Naturalization Services (INS) and INS Detention Enforcement Officer Cesar Garcia visited the accident scene. Agent Schaufelberger found documents at the scene indicative of illegal aliens. She was further told that over ten people who appeared to be natives of another country were passengers in the Suburban involved in the accident.

At approximately 7:15 or 7:30 a.m., Agent Schaufelberger and Officer Garcia arrived at St. Mary's Hospital. Agent Schaufelberger testified that she went to the hospital to investigate the immigration status of the passengers in the accident and to assist the hospital staff in communicating with the passengers in Spanish. The occupants of the Suburban, including defendant, did not speak English, and apparently none of the hospital employees spoke Spanish.

Shortly after arriving at the hospital, Agent Schaufelberger observed defendant being treated on a hospital bed. At approximately 9:00 a.m., Agent Schaufelberger, dressed in street attire, approached defendant at his bed and asked him, in Spanish, his name, place of birth, and whether he had papers to be in the United States legally. She testified that she asks these questions of all possible illegal aliens and did not ask them specifically as part of a criminal investigation. According to Agent Schaufelberger, defendant responded to her questions in a manner that revealed he understood what was asked.

Based upon defendant's answers to her questions, Agent Schaufelberger concluded he was probably an illegal alien. She testified that defendant was not free to leave the hospital and would be taken into INS custody as soon as he was discharged.

At approximately 9:30 or 9:40 a.m., the hospital staff informed Agent Schaufelberger that defendant was about to be released and asked her to assist in explaining the discharge instructions to defendant. At that time, defendant told Agent Schaufelberger he was in pain and indicated his back and shoulder were sore. Agent Schaufelberger relayed this information to the hospital staff who responded that they had examined defendant, and he was all right. The hospital staff also stated they did not want to give defendant narcotic pain medication because of his possible head injury, but he could take Tylenol or Advil. Agent Schaufelberger relayed the information about the pain medication to defendant, and, she testified, defendant understood. As Agent Schaufelberger began reviewing the discharge instructions with defendant, she discovered his hand needed medical attention. Defendant was then taken to have his hand treated, and Agent Schaufelberger left to assist other patients.

After Agent Schaufelberger left, Officer Garcia, a native Spanish speaker, was asked to assist with defendant's discharge. He translated the discharge instructions into Spanish for defendant. Then, in response to Officer Garcia's statement to defendant that a nurse needed his signature for his release, defendant stated, "Okay" and signed the form. Defendant was not released on his own but was taken to the hospital waiting room in a wheelchair to await transportation to the INS office.

At approximately 10:30 a.m., Agent Schaufelberger and four Utah Highway

Patrol troopers approached defendant in the waiting room and asked him questions about the insurance and registration for the vehicle. Agent Schaufelberger testified that, at this time, the officers knew defendant was the owner of the Suburban. Defendant stated that the papers were in the Suburban, and he thought they might be in the console area.

Shortly thereafter, defendant was transported from the hospital to the INS office in Grand Junction, Colorado. At some point, Officer Garcia talked to defendant in the holding cell and reviewed some of the care instructions with him. Officer Garcia stated defendant responded by nodding in the affirmative. Officer Garcia also encouraged defendant to eat and move his muscles, and defendant responded that he wanted to rest. Officer Garcia testified that it appeared defendant understood what he told him. Officer Garcia aroused defendant from his rest several times in accordance with the hospital discharge instructions for head injuries. Officer Garcia later took defendant to another room to run a computer check. Although, according to Officer Garcia, defendant needed no assistance in moving from the holding cell, he assisted defendant anyway.

At approximately 3:30 p.m., Officer Garcia moved defendant from the holding cell to an interview room by putting him in an office chair and rolling him. Officer Garcia and INS Special Agents Jeffrey White and Kate Malapanes were present while defendant was interviewed. Agent White conducted most of the interview, and Officer Garcia assisted when Agent White needed help communicating with or understanding defendant. The interview was conducted in Spanish and recorded on video tape, and a transcript of the interview was prepared by an interpreter hired by the government. The video tape and transcript were admitted as exhibits at the evidentiary hearing.

Officer Garcia testified that the transcript does not fairly and accurately depict the actual interview in several ways. First, he stated the transcript does not reflect the numerous times defendant nodded in the affirmative in response to many of the questions. Second, he testified that some of the "unintelligible" notations on the transcript can, in fact, be understood on the video. Finally, he stated that the transcript was prepared in "high Spanish" as opposed to the "conversant Spanish" used during the interview. Based upon these discrepancies, at the close of the evidentiary hearing, plaintiff requested and received leave of court to allow Officer Garcia and Agent White to compare the video tape and their personal recollections of the interview with the transcript and make any appropriate corrections to the transcript. Plaintiff has provided the court with a copy of the transcript containing the corrections made by these INS officials.

After reviewing the video tape of defendant's interview with INS officials and comparing it with the transcript, the court is of the opinion that defendant did not understand what was said to him. The transcript prepared by the interpreter begins with the following explanation:

There are linguistic issues which arise due to the fact that [Agent] Jeff [White] is a non-native speaker of Spanish who *has not learned to conjugate Spanish verbs correctly.* Verb conjugation in Spanish is the same for the second person singular formal-usted (you)-and for the third person singular non-gender specific-el/ella (he/she). "He/she/you" or "I" is indicated in parenthesis in the English translation throughout the text whenever the Spanish subject does not agree with the Spanish verb, so that *the reader may be aware that the spoken Spanish is confusing at best, incomprehensible at worst.*

There is another linguistic issue which arises when translating from Spanish in to English. There is often ambiguity in Spanish because, unlike English, Spanish verbs may be used without an expressed subject. The subject is often dropped, but implied by the context. Educated native Spanish speakers instinctively express the subject whenever it might not be clear from the context. Whenever "I/he/she/you," or any combination thereof, is used without parenthesis, it is because *it is not clear from the context which of these pronouns is the subject.*

Transcript, page 1 (emphasis added).

The first portion of the interview was devoted to attempting to inform defendant of his *Miranda* rights. As described in the interpreter's explanation and accurately detailed in defendant's memorandum, however, the video tape reveals that the Spanish spoken by Agent White was confusing and included improper vocabulary and errors in verb and pronoun usage. Moreover, although Officer Garcia is a native Spanish speaker, his assistance during the interview was insufficient in ensuring that defendant was apprised of his *Miranda* rights accurately. Additionally, the court is mindful of defendant's circumstances prior to the interview that afternoon. Defendant had been awake since the early hours of the morning, was in a roll-over accident resulting in a fatality, was treated at the hospital for a head injury among other problems, had complained of pain but had not been able to take pain medication or sleep for any length of time in view of his head injury, and, apparently, had not eaten. The court notes that, following Agent White's statements and questions, defendant was largely non-responsive. When he did respond, he nodded in an uncertain manner or stated he did not understand. Throughout the interview, defendant appeared to be exhausted.

The INS officials subsequently asked defendant to sign a form waiving his *Miranda* rights. Defendant did not read the form before he signed it. Moreover, although the form contained Agent White's notations as to his understanding of defendant's responses to questions posed to him, these notations were never read to or translated for defendant. On the first page of this waiver form, defendant printed his first name only. On the third and fourth pages, he placed what appears to be an "X" on the signature lines. When asked how he felt at that time, defendant replied "bad" and "confused". Agent White testified that, despite this response, he continued with the interview because defendant still appeared to be coherent and did not exhibit any physical signs of feeling bad or confused.

During the remaining part of the interview, defendant was asked questions relating to his possible involvement in transporting undocumented aliens. Agent White and Officer Garcia testified defendant was able to answer the questions posed to him, and his answers were responsive to the questions.

As a result of the events of March 24, 2002, plaintiff elected to prosecute defendant criminally relative to his alleged involvement in the transportation of undocumented aliens. On March 27, 2002, a federal grand jury returned an indictment charging defendant with Transporting Undocumented Aliens, pursuant to 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(1)(A)(v)(II), and (a)(1)(B)(iv) and 18 U.S.C. § 2(a). Defendant subsequently filed the instant motion.

## II. ANALYSIS

Defendant's motion is best analyzed in terms of two groups of statements defendant made on March 24, 2002:(1) statements resulting from defendant's in-

teraction with INS agents at St. Mary's Hospital, and (2) statements made during the interview with Agents White and Malapanes and Officer Garcia.

## A. *Statements Made at the Hospital*

 Defendant first argues the statements he made at St. Mary's Hospital must be suppressed under the doctor-patient privilege, pursuant to Fed.R.Evid. 501.[1] The court finds no merit in this argument. As plaintiff points out, under Rule 501, privileges are governed by common law in the absence of a relevant federal statute. "The physician-patient evidentiary privilege is unknown to the common law," *Whalen v. Roe*, 429 U.S. 589, 602 n. 28, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and it does not exist in federal statutes. *See United States v. Donley*, 878 F.2d 735, 737 n. 1 (3d Cir.1989), *cert. denied*, 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990).

 Defendant next argues that his statements to Agent Schaufelberger at the hospital should be suppressed as violating his *Miranda* rights. It is undisputed that defendant was not told of his *Miranda* rights at the hospital. As plaintiff notes, INS agents have authority "without warrant to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Defendant, however, was questioned beyond his right to be in this country. "The test to determine whether questioning is interrogation within the meaning of Miranda is whether under all of the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response

from the suspect." *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir.2002); *accord Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

In the instant case, Agent Schaufelberger testified that, after finding documents at the accident scene indicative of aliens and being informed that ten or more people who were apparently natives of another country had been passengers in the Suburban, she went to St. Mary's Hospital. She testified that, upon arrival at the hospital, she already knew she was investigating a situation where there were potentially a number of illegal aliens. Moreover, Agent Schaufelberger stated that, although she helped the hospital staff with Spanish translation in order to facilitate treatment of the accident victims, she questioned defendant in her role as an INS officer, not an interpreter or hospital aide.

Agent Schaufelberger approached defendant at his bed in St. Mary's Hospital and asked him, in Spanish, his name, place of birth, and whether he had papers to be in the United States legally. She testified that, although these were routine questions, she suspected defendant was an illegal alien, and he was not free to leave the hospital. Rather, defendant would be taken into INS custody immediately upon his discharge from the hospital. Agent Schaufelberger and four highway patrol troopers later asked defendant about vehicle registration, whether the Suburban was insured, and, if so, where the insurance papers were located in the vehicle. Agent Schaufelberger stated that, at that time,

1. Rule 501 of the Federal Rules of Evidence provides, in relevant part, as follows:
 Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

she and the highway patrol troopers knew defendant owned the Suburban, and they were attempting to make a seating chart of those who were traveling in the vehicle. Agent Schaufelberger stated they asked defendant about the insurance on the Suburban on behalf of the hospital in connection with the treatment of the passengers. She further testified, however, that they suspected defendant was the front seat passenger, and that factor is significant to the INS.

■ Defendant argues the questions asked by the INS agent at the hospital were incriminating to defendant *in the context of the prosecution in this case.* The court agrees. Defendant is charged with the crime of transporting undocumented aliens. Questions about defendant's identity, place of birth, the possession of papers authorizing him to be in the country (or lack thereof), and ownership or control of the vehicle, including registration and knowledge of insurance and location of insurance documents, are "reasonably likely to elicit an incriminating response" from defendant under these circumstances. *See Salgado,* 292 F.3d at 1172. Moreover, these questions were posed by an INS officer at a time when defendant was not free to leave the hospital because he was in, or shortly would be in, INS custody. Accordingly, the court concludes defendant's statements to Agent Schaufelberger at the hospital must be suppressed and hereby GRANTS defendant's motion on this point.

B. *Statements Made During the Interview*

Plaintiff concedes defendant was in custody during the interview with INS officials White, Malapanes, and Garcia. Plaintiff argues, however, that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights before making any statements.

■ The burden is upon the government to show a voluntary, knowing, and intelligent waiver of *Miranda* rights through a preponderance of the evidence. *See Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Resolution of the question whether defendant's waiver of his rights was compelled involves a two-pronged analysis. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* However,

> [t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The Miranda warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The Miranda warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (citations omitted). Moreover,

[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.

*North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Thus, whether defendant's waiver of his *Miranda* rights during the interview was voluntary, knowing, and intelligent is a factually-sensitive question.

 After a close review of the video tape of the INS interview and the English transcription of that interview, the court cannot conclude that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. As stated above, the court is of the opinion that, due to defendant's difficult circumstances on the day of the interview, coupled with an inadequate explanation of his rights delivered in confusing Spanish, defendant neither understood his *Miranda* rights nor the form he signed which purportedly waived them. Defendant did not read the form waiving his *Miranda* rights, and the INS officials did not fully explain or translate the form, or the INS notations thereon, for him. Therefore, the court cannot find that defendant's purported waiver was the "product of a free and deliberate choice" and made "with a full awareness" of his rights and the consequences of waiving them. Accordingly, defendant's motion to suppress his statements made during the INS interview is hereby GRANTED.[2]

2. Defendant also argues the integrity of the video tape of the INS interview is suspect due to an unexplained gap of seven minutes on the internal time meter of the tape. This argument was not developed during the evidentiary hearing, and the court need not address it in view of the court's conclusion that defendant's statements during the interview must be suppressed.

### III. CONCLUSION

In sum, the court finds that the statements defendant made both at St. Mary's Hospital and during the INS interview must be suppressed. Defendant's motion to suppress is GRANTED in its entirety.