**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

              v.

LIN CHEN,

              *Defendant-Appellee.*

No. 05-10108

D.C. No.
CR 01-051 DWH

OPINION

Appeal from the District Court of Guam
David W. Hagen, District Judge, Presiding

Argued and Submitted
January 12, 2006—San Francisco, California

Filed March 2, 2006

Before: A. Wallace Tashima and William A. Fletcher,
Circuit Judges, and Edward F. Shea,* District Judge.

Opinion by Judge Tashima

---

*The Honorable Edward F. Shea, United States District Judge for the
Eastern District of Washington, sitting by designation.

## COUNSEL

Kirby A. Heller, Criminal Division, U.S. Department of Justice, Washington, D.C., for the plaintiff-appellant.

John T. Gorman, Federal Public Defender, Mongmong, Guam, for the defendant-appellee.

## OPINION

TASHIMA, Circuit Judge:

In this interlocutory appeal, the government challenges the district court's decision to suppress statements made by

defendant Lin Chen ("Chen"). Chen made the statements during an interview with an Immigration and Naturalization Services ("INS")[1] agent who was investigating a third party suspected of running an alien smuggling ring. At the time of the interview, Chen was in custody in Guam on an administrative deportation warrant. The district court concluded that the INS agent was required to give a *Miranda*[2] warning before the interview. The court therefore granted Chen's motion to suppress, and the government now appeals. We have jurisdiction under 18 U.S.C. § 3731 and affirm the district court's decision to suppress Chen's statements.

## Background

On January 10, 2001, INS Special Agent Timothy Conway ("Conway") and other INS agents executed a search warrant at Apartment 101 at the Harmon Gardens apartment complex. The search warrant was in connection with the criminal investigation of Ho Chun Li ("Li"), who was suspected of smuggling aliens. A confidential informant had revealed to the INS that numerous illegal aliens were living in the apartment. The agents encountered approximately 14 illegal aliens in the apartment, including Chen. When questioned about his citizenship, Chen stated that he was a Chinese citizen. He was then taken into administrative custody, pending a final determination by an Immigration Judge ("IJ").

On January 12, 2001, Chen was served with a notice informing him that he had been arrested "because immigration officers believe that you are illegally in the United States," and further informing him that he had a right to a hearing before an IJ. The same day, while Chen was in INS

---

[1]The INS has been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2142 (2002), 6 U.S.C. §§ 101-557. This opinion will refer to the government agency as the INS.

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

custody, Conway questioned Chen about how he arrived in Guam. According to Conway, this questioning was in connection with Conway's investigation of Li, the suspected smuggler. Chen stated that he came to Guam on a Taiwanese fishing boat on June 3, 2000, and that he left the ship once it reached port. Chen further stated that he was directed to 101 Harmon Gardens, and consequently to Li, by an unnamed stranger. At the time of the interview, Conway knew Chen had an attorney, but did not call Chen's attorney prior to questioning Chen. Conway also interviewed the other aliens from 101 Harmon Gardens. They, like Chen, indicated that they had arrived in Guam as crewmen on fishing boats.

On February 22, the IJ held a bond hearing for the aliens who had been arrested at 101 Harmon Gardens, including Chen. At the hearing, all of these individuals were represented by the same attorney. Local residents signed the bonds and paid for the releases of the aliens. Conway later testified that at this time he became suspicious that Chen and the other aliens were lying about their means of arrival in Guam. Conway obtained lists of the fishing vessels that had arrived in Guam and determined that the aliens' stories did not comport with the fishing vessel documentation. Conway forwarded the materials dealing with his investigation of these aliens to the United States Attorney's Office.

Criminal charges were filed against Chen and four other residents of the Harmon Gardens apartment for perjury, in violation of 18 U.S.C. § 1621, and the making of a false statement in a matter within the jurisdiction of the INS, in violation of 18 U.S.C. § 1001. The perjury charge arose from statements contained in Chen's October 2000 asylum application, in which he stated that he had arrived on June 3, 2000, on a fishing boat, and the false statement charge arose from Chen's allegedly false statements to Conway on January 12, 2001, recounting basically the same story.

Before the grand jury, Conway served as the primary witness, testifying that all of the aliens' stories were untrue

because the boat names and dates the aliens provided in their interviews did not comport with Guam's port records. He also indicated that at the time Chen was arrested, Conway already had formed a suspicion that Chen had been smuggled: "Well, if we think they are being smuggled into the United States and we arrest them, we interview them as to how they came here and that sort of thing." The grand jury hearing concluded with the prosecutor's statement that "[i]t's obvious — what I'm doing, of course [in prosecuting the aliens for perjury] — I'm after Ho Chun Li and nobody will cooperate with me, so I'm going to put on a little pressure. And even then, they probably won't cooperate with me. They'll probably just stonewall."

Chen subsequently moved to suppress his statements made to Conway at the January 12 interview. He argued that the questioning constituted a "custodial interrogation," and that Conway's failure to administer a *Miranda* warning therefore rendered the statements inadmissible. The district court held an evidentiary hearing at which Conway testified that at the time he interviewed Chen, he did not suspect Chen of any criminal wrongdoing. He acknowledged that illegal entry was a crime, but testified that such violations are "not usually" prosecuted in Guam. He further testified that his criminal investigation of Chen began only after his suspicions were raised when the local Guam residents signed the aliens' bonds.

The court granted the motion to suppress, holding that Conway's knowledge of Chen's illegal presence in the country made the questioning reasonably likely to elicit incriminating statements. In its written opinion, the court found that Conway interrogated Chen with a "dual purpose": both to determine whether Chen's presence in the country was illegal, and also to ascertain information for Conway's criminal investigation of Li. In its oral decision, the court emphasized that a *Miranda* warning was required because illegal presence in the United States is a crime, Chen was believed to have committed that crime, he was in custody because of INS agents' sus-

picion that he had committed that crime, and the agent's questions related to that crime. After the ruling, the government filed a motion for reconsideration, which the court denied. The government then filed this interlocutory appeal.

## Discussion

The district court's determination that the government's questioning was an "interrogation" for *Miranda* purposes is a mixed question of law and fact, which we review *de novo*. *United States v. Padilla*, 387 F.3d 1087, 1093 n.4 (9th Cir. 2004). We review the district court's underlying findings of fact for clear error. *United States v. Camacho*, 368 F.3d 1182, 1183 (9th Cir. 2004).

[1] *Miranda* prohibits "custodial interrogation" unless the government first provides the suspect with certain warnings. 384 U.S. at 444. Not every question asked in a custodial setting,[3] however, constitutes "interrogation." *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982). The test is whether, under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect." *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The investigating officer's subjective intent is relevant but not determinative, because the focus is on the perception of the defendant. *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994).

Several Ninth Circuit cases have analyzed whether INS agents' investigations of illegal immigrants constitute "interrogations." In *United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983), we concluded that the questioning conducted by an INS investigator constituted an "interrogation" when there was a "close sequence" between the "civil" investigation

---

[3]The government does not contest the district court's finding that this interview was "custodial" for *Miranda* purposes. Therefore, we do not review that finding.

and the criminal prosecution. *Id.* at 1279-80. The defendant in *Mata-Abundiz* had been jailed on charges of carrying a concealed weapon and possession of a firearm by an alien. *Id.* at 1278. The INS agent's questioning about alienage was likely to elicit incriminating responses because the INS investigator knew that evidence of alienage, coupled with evidence of firearms possession, could lead to federal prosecution under 18 U.S.C. § 1202. *Id.* at 1279. Moreover, the INS investigator began a "full-fledged criminal investigation[ ]" only three hours after he ended the "civil" or administrative INS interview. *Id.* In concluding that the INS questioning constituted an "interrogation," we relied on *Mathis v. United States*, 391 U.S. 1 (1968), in which the Supreme Court held that *Miranda* warnings are required before conducting "routine" tax investigations of persons in custody, because tax investigations "frequently" lead to criminal prosecutions. *Mata-Abundiz*, 717 F.2d at 1279 (citing *Mathis*, 391 U.S. at 4). *Mata-Abundiz* concluded that the facts in that case demonstrated the need for a *Miranda* warning in civil custodial investigations "even more vividly" than did the facts in *Mathis*. *Id.*

By contrast, in *United States v. Salgado*, 292 F.3d 1169 (9th Cir. 2002), we concluded that an INS agent's purely administrative interview of the defendant was not an interrogation for *Miranda* purposes. *Id.* at 1174. The defendant in *Salgado* was arrested on state law charges in 1998 and, while in state custody, the INS interviewed the defendant for the "sole purpose" of determining whether the defendant was subject to an administrative action for deportation. *Id.* at 1172. After being deported, the defendant illegally re-entered the country in 1999 and was prosecuted for illegal re-entry under 8 U.S.C. § 1326.[4] *Id.* at 1171-72.

---

[4]8 U.S.C. § 1326 makes it a crime for an alien who has been excluded, deported, or removed to reenter the United States without the consent of the Attorney General. 8 U.S.C. § 1325 makes it a crime for an alien to enter the United States improperly, *e.g.*, by eluding a border inspection or by a false representation. Any differences between a prosecution for illegal reentry under § 1326 and for illegal entry under § 1325 are immaterial to the disposition of this case.

We held that the 1998 statements to the INS agent were admissible in the 1999 prosecution even though no *Miranda* warnings had been administered. *Id.* at 1174. In doing so, we distinguished this case from those in which the INS questioning was "in connection with a prosecution for violating the immigration laws," or where the defendant "had been in custody on charges relating to his immigration status." *Id.* at 1172 (internal quotation marks omitted). We emphasized that the INS' questioning of the defendant was "solely for the administrative purpose" of determining whether the defendant was deportable after release from jail. *Id.*

In *Salgado*, we reasoned that the questioning had not been likely to elicit incriminating statements because the INS agent could not have reasonably foreseen that the defendant would re-enter the country a year later and commit another crime.[5] *Id.* at 1173. Moreover, the INS' questioning did not relate directly to "an element of the crime which the investigator had reason to suspect that [the defendant] had committed." *Id.*

Between *Mata-Abundiz* and *Salgado*, we decided *United States v. Gonzalez-Sandoval*, 894 F.2d 1043 (9th Cir. 1990), where we suppressed un-*Mirandized* statements elicited by border patrol officers when the statements were actually "used to help prove the charges of illegal entry and being a deported alien found in the United States." *Id.* at 1047. Likewise, in *United States v. Equihua-Juarez*, 851 F.2d 1222 (9th Cir. 1988), we held that an INS agent's questions about defen-

---

[5]*Salgado* relied heavily on *United States v. Solano-Godines*, 120 F.3d 957 (9th Cir. 1997), which held that an IJ's questioning during civil deportation proceedings did not require *Miranda* warnings, even though the statements elicited at the hearing were used in the defendant's subsequent prosecution for illegal reentry. *Id.* at 962. *Salgado* concluded that *Solano-Godines* was controlling, because neither the IJ in *Solano-Godines* nor the INS agent in *Salgado* could have reasonably anticipated that the defendant would be prosecuted for a subsequent illegal re-entry in which the earlier statements about immigration would be used by the prosecution. *See Salgado*, 292 F.3d at 1173-74.

dant's biographical information constituted an "interrogation" when the information was used to determine whether the alien should be deported or criminally prosecuted. *Id.* at 1226-27. These cases are distinguishable from *Salgado* because such questioning, in the words of *Salgado*, was "in connection with a prosecution for violating the immigration laws" or involved a defendant who "had been in custody on charges relating to his immigration status." 292 F.3d at 1172. The alienage-related questioning in *Salgado*, by contrast, was merely for the administrative purpose of assessing a defendant's eventual deportability and was not conducted for the purpose of a criminal investigation.

**[2]** None of these cases directly addresses the question of whether routine INS questioning constitutes an "interrogation" if the statements elicited would incriminate the defendant only as to misdemeanor illegal entry under 8 U.S.C. § 1325. *See Salgado*, 292 F.3d at 1175 & n.1 (Pregerson, J., dissenting) (arguing that *Miranda* warnings were required by pointing out, *inter alia*, that an alien-defendant's response to INS questioning necessarily incriminates that defendant in a § 1325 violation). Our previous cases, including *Salgado* and *Solano-Godines*, focused on whether the questioning was incriminating as to § 1326 liability, because that was the crime actually prosecuted. *See Salgado*, 292 F.3d at 1173-74; *Solano-Godines*, 120 F.3d at 961-62. In *Mata-Abundiz*, we noted that "[c]ivil as well as criminal interrogation of in-custody defendants by INS investigators should generally be accompanied by the *Miranda* warnings." 717 F.2d at 1279. Were the inherent threat of § 1325 prosecution enough to render INS questioning an "interrogation," *all* alienage-related questioning, at least where the interviewing officer had reason to suspect the defendant was an alien, would require *Miranda* warnings. We need not reach that question on the particular facts before us, however, because the facts here demonstrate that Chen was subject to an especially heightened risk of a § 1325 prosecution. The particular circumstances of this case — namely, the prosecutor's willingness to pursue charges

against Chen in order to procure Chen's testimony against Li, and the fact that Chen was questioned in a district that has a practice of prosecuting § 1325 violations — rendered Conway's questioning of Chen an "interrogation" for *Miranda* purposes. *See Booth*, 669 F.2d at 1237 (holding that the test for determining whether questioning constitutes "interrogation" should be analyzed under a totality of the circumstances standard).

[3] Conway testified at the suppression hearing on February 8, 2005, that illegal entry violations are "not usually" prosecuted and that no illegal entry cases were prosecuted in Guam in "the last year." Even if illegal entry violations were "not usually" prosecuted in Guam, Chen was the subject of heightened INS scrutiny because of his association with Li. The authorities suspected Chen of being a participant in a smuggling scheme, and needed his testimony to bolster their criminal case against Li, the suspected leader of the smuggling ring. Chen was arrested at Li's home, had been identified by a confidential informant as one of several aliens smuggled and/or housed by Li, and was likely a relative of Li's. One purpose, if not the principal purpose, of the government's pursuit of its perjury case against Chen was to elicit incriminating testimony from Chen against Li. At Chen's grand jury hearing, the prosecutor declared that "[i]t's obvious — what I'm doing, of course — I'm after Ho Chun Li and nobody will cooperate with me, so I'm going to put on a little pressure." Because of the government's interest in procuring Chen's testimony against Li, the possibility of the government prosecuting Chen was especially high.

[4] Moreover, the Federal Public Defender of the District of Guam ("FPD") has represented, and the government has not contested,[6] that between 1998 and 2004 the FPD's office has represented 48 persons accused of illegal entry in the Dis-

---

[6]The government did not challenge this representation either in its reply brief or at oral argument.

trict of Guam.[7] Because of the government's interest in procuring Chen's testimony and the U.S. Attorney's practice of prosecuting § 1325 violations, Conway's questioning about Chen's alienage was reasonably likely to elicit a response that would incriminate Chen in a § 1325 prosecution. *See Mathis*, 391 U.S. at 4 (requiring *Miranda* warnings before "routine" tax investigations of persons in custody because such investigations "frequently" lead to criminal prosecutions).

## Conclusion

**[5]** We need not decide today whether questioning that would elicit an alien's admission of illegal presence in the United States will always constitute an "interrogation" for *Miranda* purposes. Rather, we conclude that INS Agent Conway's questioning of Chen in the circumstances of this case constituted an "interrogation" because the government's interest in Chen's testimony and the U.S. Attorney's practice of pursuing § 1325 prosecutions combined to create a heightened threat that the defendant might actually face a § 1325 prosecution.

**[6]** Accordingly, the decision of the district court granting Chen's motion to suppress is **AFFIRMED**.

---

[7]The District of Guam is a small jurisdiction. In 2004, a total of 152 cases were filed in the district court, and the FPD opened 129 cases. Office of the Circuit Executive, 2004 Annual Report, Ninth Circuit United States Courts at 59, 69.